07-2567-cr
United States v. Sabhnani

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———

August Term, 2006

(Argued:  June 26, 2007     Decided:  July 6, 2007)

Docket Nos. 07-2567-cr(L), 07-2615-cr(con)

———

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

MAHENDER MURLIDHAR SABHNANI,
VARSHA MAHENDER SABHNANI

*Defendants-Appellants*.

———

Before:

WINTER, CABRANES, and RAGGI, *Circuit Judges.*

Appeal from an order of detention entered in the United States District Court for the

Eastern District of New York (Thomas C. Platt, *Judge*).

VACATED AND REMANDED.

———

SUSAN C. WOLFE, Hoffman & Pollok LLP (Jeffrey C. Hoffman, *on the brief*),
New York, New York, *for Defendant-Appellant* Varsha Mahender
Sabhnani.

1

STEPHEN P. SCARING, Scaring & Brissenden, PLLC, Garden City, New York, *for Defendant-Appellant* Mahender Murlidhar Sabhnani.

MARK J. LESKO, Assistant United States Attorney (Peter A. Norling, Demetri Jones, Carrie Capwell, Assistant United States Attorneys, *on the brief*), *for* Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

REENA RAGGI, *Circuit Judge*:

Defendants Varsha Mahender Sabhnani and Mahender Murlidhar Sabhnani appeal from permanent orders of detention entered pursuant to 18 U.S.C. § 3142(e) on June 11, 2007, in the United States District Court for the Eastern District of New York (Thomas C. Platt, *Judge*). The Sabhnanis do not challenge the district court's finding that, if released, they pose a serious risk of flight. Rather, they challenge its conclusion that no conditions can be imposed that would reasonably assure their presence at trial. We generally accord considerable deference to such a district court conclusion. In this case, however, defendants' argument has been cast in a new light by the government's identification in this court of the further conditions it deems necessary to ameliorate the risk of flight. See Appendix to this Opinion.[1] The government's ability to identify such conditions and the defendants' willingness to accede to them preclude a conclusion in this case that no conditions of release

---

[1] In response to this court's request that it identify any and all conditions that it deemed necessary to assure defendants' appearance, the government has amended the last proposed "Order Setting Conditions of Release" submitted by defendants to the district court. The government's changes are reflected in the noted deletions and highlighted additions to the draft proposal. The release proposal, as amended by the government, is hereafter referred to as the "Appendix Agreement."

2

would reasonably assure the defendants' presence at trial.[2]  Accordingly, we vacate the challenged order of detention and remand this case to the district court so that the parties can provide the assurances and finalize the arrangements referenced in the defendants' last proposed conditions of release, as now amended by the government, whereupon appropriate bail release orders should be executed by the district court.

## I. Background

### A. The Charges Against Defendants

Varsha Sabhnani and her husband Mahender Sabhnani are charged with two counts of forced labor, see 18 U.S.C. §§ 1589, 1594(a), and two counts of harboring illegal aliens, see 8 U.S.C. § 1324.  The charges stem from allegations that, for the five-year period from 2002 to 2007, the defendants held two Indonesian women in peonage at their Long Island home, denying them freedom of movement, subjecting them to serious physical abuse, and paying them no wages for their domestic labor save for approximately $100 per month transmitted to relatives in Indonesia.

### B. Defendants' Background

Defendant Varsha Sabhnani is herself a native of Indonesia.  She has resided in the

---

[2]As we note in the "Background" section of this opinion, at oral argument, this court pressed the government to identify particular reasons why it thought that a risk of flight continued to exist under the release conditions agreed to by defendants in the district court. In response to the few reasons offered by the government, defendants indicated their willingness to abide by still further conditions to meet these concerns.  The government responded with only conclusory objections to release.  It was against this backdrop that we requested the government to identify any and all further conditions of release necessary to assure defendants' appearance, resulting in the Appendix Agreement.

3

United States for more than twenty-five years and, in 2001, became an American citizen. Her husband Mahender Sabhnani is a native of India who has resided in this country for almost thirty-five years. He became an American citizen in 1980. Defendants' four children, ranging in age from 17 to 23, are all American citizens born in this country. These children continue to reside at the family home on Long Island where the charged crimes purportedly occurred. When defendants' three adult daughters were questioned by authorities about the circumstances giving rise to the pending charges against their parents, each invoked her Fifth Amendment right against self-incrimination.

Defendants' alleged procurement of forced domestic labor took place against a backdrop of significant wealth. For example, defendants own outright their Long Island home and a Manhattan apartment, properties having a total value in excess of $3 million. Their known cash and securities holdings total $3 to $5 million. Jewelry, stored in safety deposit boxes, is valued at approximately $500,000.

Defendants' wealth apparently derives from a perfume and cosmetics business, which manufactures its products in the United States, the United Kingdom, and Indonesia, and markets these products throughout the world, most particularly in the Middle East.

C.    Events Leading to Defendants' Arrest

Defendants, who have no criminal records, first attracted law enforcement attention on May 13, 2007. Shortly after 6:00 a.m. on that day, employees of a Long Island donut shop called 911 to request assistance for a seemingly homeless woman. The woman, who was

4

dressed only in pants and a towel, had used hand gestures and halting words to convey to shop employees that she had been struck repeatedly in the face by her "master." With the aid of an interpreter, federal and local authorities learned from the woman that she was a native of Indonesia who, since February 5, 2002, had worked as a domestic servant for the defendants. The woman explained that she received no direct payment for her labor; rather, defendants sent $100 per month to her daughter in Indonesia. Throughout her years of forced servitude, she was not permitted to leave the defendants' home, was forced to sleep on a floor mat, and rarely received adequate amounts of food. Moreover, she alleged that she experienced routine physical abuse at the hands of Varsha Sabhnani and with the knowledge of Mahender Sabhnani. This abuse purportedly included beatings with a stick, flesh cuts made with a small knife, and burns inflicted by throwing scalding water. Law enforcement officers observed — and subsequently photographed — dozens of scars and bruises on the woman's face, neck, back, chest, and arms, which she attributed to the described abuse. The woman advised the officers that another Indonesian woman was also then working at the defendants' home under similar forced conditions.

Based on this information, law enforcement officers executed a search warrant that same day at the defendants' home. There they found the second Indonesian woman hiding in a small closet, and they seized various items that appeared to corroborate the account of physical abuse. In response to questions posed by law enforcement officers, defendants admitted knowing that the two Indonesian women were illegally present in the United States.

5

The following day, May 14, defendants were arrested on forced labor charges.

D.    Defendants' Detention

To explain our ruling on this appeal, we necessarily begin with a review of the extensive bail litigation in the district court.

1.    The Magistrate Judge's Order of Release

The question of defendants' release pending trial was initially addressed by Magistrate Judge A. Kathleen Tomlinson. In a May 15 letter to Judge Tomlinson, the government requested an order of detention against both defendants, arguing that, if released, they would present a risk of flight and a danger to other persons, specifically their victims and members of the victims' families. Because the government does not here challenge the rejection of its danger argument by both Judge Tomlinson and Judge Platt, we do not discuss that issue further in this opinion.

With respect to flight, the government submitted that the defendants had a strong motive to flee the United States because the evidence of their guilt was compelling; and upon conviction, they faced a significant term of incarceration, specifically, a statutory maximum of forty years' imprisonment and a Guidelines range of 210 to 262 months.[3] The government further noted defendants' means and opportunity to flee, evidenced by their vast financial resources, and their personal and professional contacts with numerous foreign

_____

[3]Although defendants dispute this range, they can hardly demonstrate clear error in the conclusions of both Judge Tomlinson and Judge Platt that, if convicted, they likely faced a substantial term of incarceration.

6

countries. The government noted that, between June 2005 and October 2006, one of defendants' corporate bank accounts had received wire transfers totaling $17,241,902, most of these transfers originating from the Kingdom of Bahrain, Qatar, and the United Arab Emirates, countries with which the United States did not have extradition treaties.

In a responsive letter dated May 17, 2007, defendants' counsel disputed the government's contention that their clients presented a serious risk of flight. Nevertheless, they submitted that release conditions could be imposed that reasonably ameliorated any such risk. Specifically, they proposed: (1) personal recognizance bonds of $1.5 million for each defendant, secured by the signature of six persons and by the entry of confessions of judgment against the defendants' Long Island home and Manhattan apartment; and (2) defendants' home detention at their Long Island residence, subject to (a) electronic monitoring of the defendants' persons by the court's Pre-Trial Services Office, (b) 24-hour per day electronic monitoring of defendants' residence by a private investigation firm (with the expense born by defendants), (c) pen register monitoring of defendants' telephone calls, and (d) surrender of defendants' passports.

At the bail hearing before Judge Tomlinson that same day, the government continued to urge defendants' detention, arguing that "[t]here is absolutely nothing to stop them from leaving this country and tak[ing] their children with them. . . . [T]hey have family in Indonesia, and their [business] can be run from anywhere in the world." Tr. May 17, 2007, at 39. With respect to defendants' proposed bail package, the government submitted that it

7

was deficient in several respects. First, the proposed bonds were inadequately secured because one of the pieces of real property — the defendants' Long Island home — was subject to forfeiture as an item used in furtherance of the charged crime (and already restrained as such), and, "most troubling," defendants were not posting any "cash or other financial asset" despite the fact that they had identified security holdings of $3 million in their Pre-Trial Services interview. Id. at 10-12. The government also questioned the reliability of a summary of defendants' assets supplied by their accountant, noting that the submission was unsworn and unsupported by copies of tax returns. Further, the summary failed to explain wire transfers in excess of $17 million from countries in the Middle East into defendants' business account.

Defense counsel advised the court that their clients had retained another accountant to review and report in detail on the business transactions of concern to the government. Meanwhile, counsel acknowledged "additional assets" that could be pledged or restrained to secure defendants' bail release, notably, approximately $3.25 million in securities accounts; $300,000 in cash savings; a $500,000 pension fund; and various life insurance policies, at least one of which was in the amount of $1 million. Counsel represented that "[t]here are no other assets other than what we have described here today." Id. at 37.

After reviewing the parties' submissions and hearing their arguments, Judge Tomlinson concluded that the government had demonstrated that defendants posed a risk of flight. Nevertheless, she determined that the risk could be sufficiently ameliorated by "very

8

specific conditions" of bail release. Id. at 54. In so ruling, Judge Tomlinson took note of the seriousness of the charged crime and the weight of the evidence. At the same time, however, she noted that the alleged conduct was not represented to be part of any ongoing criminal enterprise or human trafficking ring. Acknowledging the defendants' extensive business and family contacts in foreign countries, Judge Tomlinson noted that "thus far, there is no indication of any bank accounts actually set up in foreign countries, or access, at least any type of direct access[,] to financial accounts abroad." Id. at 48. Further mitigating against detention was defendants' long residence in the United States, their United States citizenship, their four children's American citizenship and continued residence in the family home, their business operations in the United States, their lack of any criminal record, their failure to flee in the twelve hours between the search of their home and their arrest, and the surrender of their passports.

In light of these circumstances, Judge Tomlinson ruled that defendant Varsha Sabhnani would be released on a secured $2.5 million personal recognizance bond, while defendant Mahender Sabhnani would be released on a secured $1 million personal recognizance bond. The court would not accept defendants' restrained Long Island home as security. Rather, the bonds were to be secured by a confession of judgment against defendants' Manhattan apartment, as well as by restraining orders placed on all personal financial accounts controlled by defendants. The bonds would also be secured by restraining orders on defendants' business accounts, although these orders would be limited to allow the

9

businesses to meet daily operating expenses and business obligations. Further, defendants' release would be subject to home detention to include electronic monitoring of their persons and pen-register monitoring of their telephones. Pre-Trial Services was to be given unrestricted access to defendants' home, which they could not leave except as authorized to visit their attorneys, attend religious services, and keep medical appointments. The expenses of home detention would be borne by defendants.[4]

### 2. The District Court's Order of Detention

#### a. The Government Seeks to Reopen the Question of Bail Release

On May 22, a grand jury sitting in the Eastern District of New York returned the pending indictment against defendants. Appearing before District Judge Thomas C. Platt on May 24, the government sought to reopen bail proceedings. It asserted that "the defense has not even come close to meeting their burden" to rebut the risk of flight "in terms of providing the government and the court with adequate information regarding the defendants' financial history, financial details, the corporation they control, their contacts overseas." Tr. May 24, 2007, at 9.[5] The government questioned the credibility of defendants' financial

---

[4]Judge Tomlinson did not order round-the-clock private surveillance of defendants' home because, at that time, the government opposed any private monitoring.

[5]As we explain infra at **[23-24]**, the government misstated the law. Where, as in this case, the charge against the defendant does not trigger a statutory presumption that no conditions of release can adequately assure the defendant's attendance at trial, it is the government's burden to demonstrate by a preponderance of the evidence both that a defendant presents a risk of flight and that no condition or combination of conditions can be imposed reasonably to assure his required attendance. See 18 U.S.C. § 3142(e). We note that the district court correctly identified this dual burden in its challenged ruling of June 11.

10

representations with respect to both the value of their securities holdings and their access to overseas accounts. The government noted that, within the past five years, Mahender Sabhnani had engaged in financial transactions totaling $850,000 with his brother Ashok Sabhnani in Dubai. The government also noted that defendants subcontracted some of their manufacturing operations to two companies in the United Kingdom. "We have no indication whatsoever of the relationship between the Sabhnanis and those companies. Do they own those companies? Do they have interests in those companies? Do those companies maintain bank accounts for the benefit of the Sabhnanis? We don't know." Id. at 21.

Defense counsel indicated their clients' willingness to provide further financial information. They noted only that previous inquiries to the government as to whether additional information might permit agreement on bail release had been met with a singular response: "We want to see these people detained." Id. at 23. The district court directed the government to provide the defense with a detailed list of any questions regarding defendants' assets, and it adjourned further consideration of bail pending the parties' communications.

In a letter dated May 24, 2007, the government sought defense production of nineteen categories of information.[6] Defendants did not oppose these extensive requests.

---

[6]The government's production demand was exhaustive, a point best demonstrated by reproducing it.

1)      The identity and business records for all corporations, partnerships, and other business entities in which the defendants have a financial interest, foreign or domestic (collectively, "the businesses");

2)      Payroll records for the businesses, including but not limited to ADP

11

payroll records, for the businesses since January 1, 2002;

3) Financial statements for the defendants and the businesses, including general ledgers for the businesses, income statements and balance sheets for the businesses, cash receipts and disbursements journals for the businesses from January 1, 2005 to the present;

4) The identity of all financial accounts, including but not limited to bank accounts, brokerage accounts, certificates of deposits, retirement accounts, pension funds, and any accounts in which the defendants, the businesses, and the defendants' children have a beneficial interest, foreign and domestic (collectively, the "accounts"), the current balances of the accounts, and statements for the accounts since January 1, 2002;

5) The identity of all personal loans, debts, promissory notes or other obligations involving the defendants and their children;

6) A description of all funds transferred to or from "Ashok M. Sabhnani" or any other relatives of the defendants to the defendants, the businesses, and/or the defendants' children, including the identity of bank accounts owned or controlled by "Ashok M. Sabhnani" or any relatives of the defendants and a description of any funds held by "Ashok M. Sabhnani" or any relatives of the defendants for the benefit of the defendants;

7) All records of transfers of funds by the defendants and the businesses to any entity or person in any foreign country since January 1, 2002;

8) The identity of any securities owned and/or controlled by the defendants, the businesses, the defendants' children, and/or any other nominees on behalf of the defendants, the identity of any bank or brokerage accounts where those securities are held, and any account statements or other records relating to the status of those securities;

9) The identity of any real property or thing of value, including but not limited to coins, gems, jewelry, and/or precious metals, owned and/or controlled by the defendants, the businesses, the defendants' children in the United States and any foreign country;

12

10) The existence and location of any safe deposit boxes;

11) A description of the current cash/face value of all insurance policies, annuities, or any other financial instruments for which the defendants, the businesses, or the defendants' children are the owners and/or beneficiaries;

12) A description of the relationships between the defendants and the businesses and any foreign and domestic corporation, partnership, or business entity, including but not limited to Expac (sic) and Statestrong (sic) in the United Kingdom;

13) The source and amount of funds paid to or held in escrow by all attorneys currently representing the defendants, the businesses or the defendants' children in any criminal or civil matter;

14) The source of the funds used to purchase the property located at 1600 Broadway, Apartment 17G, New York, New York[;]

15) All federal, state, and foreign tax returns, including all corporate and partnership income tax returns, employment tax returns, individual income tax returns, including all IRS Forms 1099 and W-2, filed or received by the defendants, the businesses and their children from 2002 to the present; and

16) The telephone numbers for the cellular telephones owned and/or used by the defendants' children (the "children's telephones"), and subscriber information for the telephones identified in the defendants' May 24, 2007 bail application as well as for the children's telephones;

17) All travel-related documents, including but not limited to all visas, passports (not already in the possession of the government), itineraries, and a description of all domestic travel since January 1, 2005;

18) An accounting of all cash and currency, foreign and domestic, that is currently in the possession of or available to the defendants, the businesses, and the defendants' children;

13

Instead, either directly or through their accountant, they produced some 15,000 pages of material.

> b. The District Court Directs the Parties to Explore Conditions of Release

Appearing before Judge Platt on May 30, the government submitted that defendants' response to its May 24 letter raised new concerns about their assets. Specifically, the disclosed documents revealed defendants' control over more than sixty personal and business accounts at some thirty-eight financial institutions. Among these were securities accounts appropriately valued at approximately $4 million, rather than $3 million as initially reported to Pre-Trial Services. One of these security accounts, which was in the name of defendants' minor son, had been used in March 2004 to repay a $214,704 obligation to Mahender Sabhnani's brother Ashok. A September 2005 statement for the account showed holdings valued at approximately half a million dollars.

Defendants offered to answer any questions regarding these accounts and transactions, but they requested the district court to order release without further delay.

After hearing from the parties, the district court proceeded to "summarize where I am" on the question of bail "and where I think you ought to go, if it is possible to go that way." Tr. May 30, 2007 at 43. The court first observed its general satisfaction with the dollar

---

19) A list of clients and contact information for all of the businesses since January 1, 2005.

Lesko Letter, May 24, 2007.

amount of the bonds ordered by Judge Tomlinson:

> [T]he question of the risk of flight is one that I think has, not completely but for the most part, [been] taken care of in [Judge Tomlinson's] decision with respect to the million dollars worth of bond from the husband, million dollars bond put up as security, and the $2-1/2 million from the wife, and the fact that the house itself is subject to the forfeiture in this case, and various other aspects of that."

Id.

Nevertheless, the district court indicated the need for more restrictive conditions of home confinement. Specifically, it directed the parties to explore arrangements for round-the-clock surveillance of defendants and their home by either government agents or private security personnel "to make sure there is no impermissible access to the people in the house by telephone, by wire, by internet,[7] and certainly by physical access other than members of the family, and the requirement that they all be subject to search, entering or leaving the premises." Id. at 45. In such circumstances, the court observed, "there would be no danger of [defendants] fleeing because they would be under constant guard." Id. The court instructed the government "to put in all the safeguards" it thought necessary to ensure the effectiveness of such round-the-clock security, and it directed defendants to bear any expenses. Id. at 46. The court noted the need to give particular attention to monitoring defendants' children "to make sure that they are not errand boys for messages between the defendants and anybody outside of the country or anywhere that would cause problems here."

---

[7]The court made plain that it expected more than pen register monitoring of defendants' wire communications. It expected the equivalent of a wiretap.

15

Id. at 47. The court advised the parties that, if they could not reach agreement "in the next few days, I will set up a set of conditions for home detention." Id. at 48.

On May 31, defense counsel advised the district court that the parties had reached agreement on bail conditions conforming to the court's directives of May 30. The government did not dispute this representation.[8]

c.     The District Court's Dissatisfaction with the Parties' Proposal

When the parties appeared before the district court on June 4 to discuss stipulated conditions for release, Judge Platt expressed dissatisfaction with their proposal, specifically, the failure adequately to guarantee defendants' payment of all costs, to provide 24-hour security inside and outside defendants' home, and to prohibit access to the home by anyone other than the defendants and their children. The court indicated that defendants should make some advance payment on the security costs, that unmonitored access points to defendants' home should be sealed, that at least two private security officers should serve on each surveillance shift, and that defendants' children should be searched on entering and leaving the family home. Both the government and the defense proposed to redraft the stipulation to address the court's concerns.

On June 5, defense counsel forwarded a new draft stipulation of conditions of release to the district court. That same day, the court issued an order stating that, "When, as, and if

_____

[8]It appears that, in the course of the parties' negotiations, defendants agreed to substitute a private security firm selected by the government for the one they had originally proposed. Various persons associated with the substituted firm had formerly been employed by the United States Attorney's Office for the Eastern District of New York.

16

the attorneys for the Defendants and the United States Attorney reach an agreement as to <u>all</u> the proposed terms of the Release, but not before, the Court will consider same and recall the same for further hearing therein." <u>United States v. Sabhnani</u>, 07-CR-429(TCP) (E.D.N.Y. June 5, 2007) (emphasis in original).

### d. The Government's Renewal of Its Request for Detention

By letter dated June 6, 2007, the government informed the district court that it did <u>not</u> agree to defendants' release on any conditions. It had negotiated terms of home confinement with defense counsel only because it had understood the court, on May 30, to indicate its intent to release defendants on that condition. Renewing its request for detention, the government identified the following supporting reasons: (1) defendants had misrepresented their finances in their initial Pre-Trial Services interview by (a) underreporting their securities holdings by $1 million, (b) neglecting to disclose ownership of $500,000 in jewelry, and (c) failing to mention their control of over sixty accounts at thirty-eight financial institutions giving them access to approximately $5 million rather than $3.3 million as reported to Pre-Trial Services; (2) they had extensive personal and business ties to foreign countries with which the United States had no extradition treaty; (3) they had failed fully to explain money transfers of $850,000 between defendant Mahender Sabhnani in the United States and his brother in Dubai or to clarify whether Mahender Sabhnani had power of attorney over accounts in his brother's name; (4) defendants had not supplied satisfactory documentation for transfers of over $17 million into their business accounts or explanations

17

for record discrepancies regarding transfers totaling $10 million out of these accounts; (5) the reliability of defendants' 2005 tax returns was uncertain and defendants had yet to file a 2006 return; (6) the exact contents of defendants' nine safety deposit boxes was unknown; and (7) the strength of the government's case against defendants and the probability of a lengthy term of incarceration gave them a motive to flee.

On June 8, defense counsel submitted to the district court what it presented as a final, revised version of the proposed conditions for release. Acknowledging the government's renewed opposition to release, counsel represented that "[a]ll of the revisions and additions requested by the Government" prior to the June 6 letter had been incorporated into the new proposal. Hoffman Letter, June 8, 2007, at 3.

e. The District Court's Orders of Detention

On June 11, the district court ordered defendants' detention. See United States v. Sabhnani, 07-CR-429(TCP), Memorandum and Order (E.D.N.Y. June 11, 2007). Preliminarily, it emphasized that on May 30 it had not ruled that defendants were entitled to release on certain conditions. Rather, it had "suggested that the parties attempt to come to an agreement as to terms of the release and submit said terms to this Court for approval." Id. at 5. Because the government opposed defendants' release on any conditions, the court was obliged to consider whether any conditions existed that would adequately mitigate any risk of flight. It concluded that there were not.

In reaching this conclusion, the district court expressed concern with defendants'

18

financial disclosures, noting their initial failure to identify all financial assets to Pre-Trial Services and their continued failure satisfactorily to explain certain financial transactions. The district court dismissed defendants' extensive record production in response to government inquiries as "sending the Government on a fishing expedition." Id. at 10. The court further faulted defendants for misrepresenting the nature of their business by advising Judge Tomlinson that their factories operated in New York and New Jersey when, in fact, a significant part of their manufacturing operations was performed by subcontractors overseas. The court noted unanswered questions as to defendants' relationship with these overseas subcontractors. The court concluded that without "an accurate picture of the Defendants' finances," both in the United States and abroad, it could not "be assured that restraining orders will prevent the Defendants or family members acting on their behalf from accessing sufficient funds to support their flight from this country." Id. at 11-12.

The district court observed that an order of detention was further supported by the strength of the evidence against defendants and the lengthy prison terms they would face if convicted. While acknowledging defendants' family and business ties in the United States, the district court considered these positive factors outweighed by defendants' ability to operate their business from any number of overseas locations. Finally, the district court concluded that home detention was impractical because it would require the imposition of onerous monitoring conditions on defendants' children, none of whom was charged with criminal conduct.

19

E.        Proceedings in This Court

Defendants promptly appealed the order of detention, requesting expeditious review by this court. At oral argument on June 26, this court noted the extraordinary scope of the restraint on assets and conditions of home confinement agreed to by defendants. We asked the government to articulate precisely its reasons for thinking these restraints and conditions inadequate to assure defendants' presence at trial. In fact, each reason identified was met by a defense offer to accommodate the specified concern. For example, when the government noted that the proposed conditions were ambiguous as to whether private security officers would accompany defendants into religious services, defense counsel agreed to such a condition. When the government expressed concern that the proposed conditions provided for a private monitor rather than a government official to examine the contents of defendants' safety deposit boxes, counsel indicated defendants' willingness to submit the boxes to government inspection. Because these exchanges strongly suggested that conditions of release that would assure defendants' presence at trial could be identified and agreed to by the parties, this court directed the government to amend the last bail proposal to incorporate therein any and all further conditions it deemed necessary to mitigate the risk of flight. The government has now complied with that request, and defendants have indicated their willingness to abide by the amended conditions of release.[9]

---

[9]To the extent defendants ask this court to modify a condition previously submitted to the district court regarding the fixed number of private security officers who must participate in round-the-clock surveillance, see Wolfe Letter, June 27, 2007, that request is denied without prejudice to renewal in the district court. We assume the government will

20

While the particulars of these supplemental conditions are noted in the appendix, we highlight the following changes:

1. Mahender Sabhnani's personal recognizance bond is increased from $1 million to $2 million, and that bond, as well as Varsha Sabhnani's $2.5 million bond, is to be <u>fully</u> secured by cash deposits and real property valued at $4.5 million. The bonds are to be further secured by defendants' shares in their primary business corporation and by the signature of their eldest daughter.

2. An independent accountant is to be appointed by the district court to review and report on all assets, including the contents of safety deposit boxes,[10] owned by the defendants or their children, either personally or through corporations, and appropriate restraining orders are to be entered as to all such assets.[11] To the extent these restraining orders allow defendants to meet certain expenses out of their accounts, the independent accountant must approve any asset transfer in excess of $10,000.

---

have no objection to the private security firm's proposal to use <u>more</u> than the fixed number of guards at the start of any period of home confinement. The district court can decide how much, if any, discretion it wishes to afford the private security firm in this area consistent, perhaps, with the firm's compliance with a court-established minimum.

[10]The government's amendments indicate that it is satisfied to have the contents of the safety deposit boxes examined by the court-appointed independent accountant rather than a federal official.

[11]We expect that the district court will ask the accountant to identify, <u>inter alia</u>, any evidence of defendants' concealment of assets. We also assume that the required review and report will take place before defendants' release. To the extent the revised conditions of release are at all ambiguous on that point, the matter should be clarified in the final release order entered in the district court.

3. Defendants consent to have any computer activity in their home, by themselves or their children, monitored by the private security firm, which is to report to the court on how such monitoring will be effected.[12]

4. A private security officer is to accompany defendants on any approved travel outside their residence, including into religious services.

5. Defendants and their children consent to certain actions by private security officers — notably temporary preventive detention and the use of reasonable force — to thwart any attempts by defendants to flee.[13]

6. Prior to defendants' release, Ashok Sabhnani, or another knowledgeable witness, is to provide the court with a sworn affidavit explaining (a) the $850,000 in international wire transfers to or from Dubai, (b) the loan repayment from defendants' son's account to Ashok Sabhnani, and (c) any accounts of Ashok Sabhnani over which Mahender Sabhnani has power of attorney.

7. Defendants agree to conduct their business affairs exclusively from their Long Island home. Any attempt by defendants or their children to conduct business activities at

---

[12]Here again, we assume this explanation will be provided and the plans for monitoring implemented before defendants' release.

[13]Defendants have also agreed to authorize private security officers to carry firearms while supervising their home detention. To the extent this implies an expectation that deadly force may need to be used to assure defendants' presence at trial, that conclusion finds no support in the record before this court. Such a conclusion would, in fact, demand a defendant's detention. Accordingly, we refer to the district court's careful consideration the question whether good and sufficient reasons support the use of armed private guards to supervise defendants' home confinement and how such conditions affect public safety.

22

any other location shall be deemed a violation of the conditions of release.

## II.    Discussion

### A.    The Government's Dual Burden of Proof to Secure Detention

The Eighth Amendment to the Constitution states that "[e]xcessive bail shall not be required." U.S. Const. amend VIII. Consistent with this prohibition, 18 U.S.C. § 3142(b) requires a court to order the pre-trial release of a defendant on a personal recognizance bond "unless the [court] determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." If the court determines that a defendant's release on an unsecured bond presents a risk of flight, the concern at issue in this case, the law still favors pre-trial release "subject to the least restrictive further condition, or combination of conditions, that [the court] determines will reasonably assure the appearance of the person as required." Id. § 3142(c)(1)(B). Only if a detention hearing shows "that no condition or combination of conditions will reasonably assure the appearance of the person as required . . . shall [the court] order the detention of the person before trial." Id. § 3142(e).[14] Under this statutory scheme, "it is only a 'limited group of offenders' who should be denied bail pending trial." United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225, at 7 (1984), as reprinted in 1984 U.S.C.C.A.N. 3182, 3189).

---

[14]Certain crimes trigger a statutory presumption that no condition or combination of conditions will reasonably assure a defendant's appearance before the court or the safety of the community, see 18 U.S.C. § 3142(e), but none of these crimes is at issue in this case.

23

Because the law thus generally favors bail release, the government carries a dual burden in seeking pre-trial detention. First, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight. See United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986). Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court. See United States v. Shakur, 817 F.2d at 195 ("The burden of proof is on the government to prove the absence of such conditions by a preponderance of the evidence."); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). The record in this case suggests that, at times, the government may have thought that this second burden fell on the defendant, or that it had the benefit of a statutory presumption of detention that the defendant was obliged to rebut. See 18 U.S.C. § 3142(e). Plainly, such a view would be incorrect.

B.     The Government's Failure to Satisfy the Second Part of Its Burden in This Case

As a rule, we apply deferential review to a district court's order of detention and will not reverse except for clear error, i.e., unless "on the entire evidence we are left with the definite and firm conviction that a mistake has been committed." United States v. Shakur, 817 F.2d at 195 (internal citations omitted); accord United States v. LaFontaine, 210 F.3d 125, 130 (2d Cir. 2000).

Applying this standard to the instant case, we easily conclude that the district court

24

committed no error in finding that defendants' release would pose a serious risk of flight.

We cannot, however, reach the same conclusion with respect to the second prong of the

government's burden, i.e., a preponderance showing that no conditions could be imposed that

would satisfactorily mitigate this risk.  The government's identification in this court of the

conditions it deems necessary to assure defendants' presence at trial, and defendants'

willingness to acquiesce in those conditions, compel us to conclude that the government

cannot, in fact, sustain its complete burden of proof on the issue of detention.  Mindful that

the government did not identify these further conditions in the district court, we hereby

vacate that court's detention orders and remand for further proceedings, which we expect will

lead to defendants' release consistent with the Appendix Agreement.[15]

In reaching this conclusion, we note at the outset our agreement with the district court

that the factors outlined in 18 U.S.C. § 3142(g) for "determining whether there are conditions

of release that will reasonably assure the appearance of [a defendant] as required" raise

serious concerns about the need for defendants' detention in this case.[16]  Without ourselves

---

[15]Our expectation rests on the assumption that the explanations called for in the Appendix Agreement will be satisfactory and the specified conditions feasible.  We do not here address whether detention would be appropriate should such explanations — particularly as reviewed by the independent accountant — reveal defendants' intent to flee the country, or should the district court determine that third parties, such as the private security firm or the independent accountant, are unable to perform the tasks set forth in the Appendix Agreement.

[16]The factors identified in § 3142(g) are

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of terrorism, or involves a

25

parsing each factor, we note, first, that defendants possess a strong motive to flee because (a) they are charged with a serious crime that allegedly involved violence; (b) the evidence of their guilt, both direct and circumstantial, appears strong;[17] (c) the charges have already subjected defendants to considerable public obloquy; and (d) if convicted, they likely face a lengthy term of incarceration. While we have not been inclined to find that such circumstances, by themselves, suffice to support detention, see United States v. Friedman, 837 F.2d 48, 50 (2d Cir. 1988) (noting that more than commission of serious crime and

> minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including –
>      (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
>      (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

[17]Defendants will, of course, enjoy a presumption of innocence at trial. See 18 U.S.C. § 3142(j). Nevertheless, in light of direct evidence from the victims of the charged forced labor and corroborative evidence of the violence used against them, we must conclude, as did Judge Tomlinson and Judge Platt, that this § 3142(g)(2) factor weighs against defendants in assessing their risk of flight.

potential long sentence is required to detain defendant as risk of flight), a second factor strengthens the case for detention: defendants' ample means to finance flight. The defendants have assets in the millions of dollars, which they could easily access to finance flight, not only for themselves but for their entire family. A third factor makes the argument for detention particularly compelling: flight would impose no insurmountable personal or professional hardship on defendants. Although they are naturalized United States citizens who have resided in this country for more than a quarter century, defendants have, not surprisingly, maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East. Defendants could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations. Indeed, a significant part of their manufacturing operations and their primary consumer markets are already located outside the United States.

Under these circumstances, considerable care must be given to identifying conditions adequate to assure defendants' presence at trial. At a minimum, defendants would have to post a secured bond in a high amount. Their willingness to do so, most recently in a total amount of $4.5 million, appears impressive at first glance. But the deterrent effect of a bond is necessarily a function of the totality of a defendant's assets. $4.5 million hardly represents the whole of defendants' assets. To address this particular issue, defendants have agreed to limited restraining orders on all their assets. The concern that has persisted since these restraints were first ordered by Judge Tomlinson is defendants' candor in disclosing the

27

assets over which they exercise personal, familial, or corporate control. The government's recent submission to this court indicates that this concern can adequately be alleviated by having the district court appoint an independent accountant to review and report on defendants' assets and to approve disbursements over $10,000. Assuming that such a report is satisfactory, we conclude that this condition adequately resolves this particular concern about defendants' release.

Defendants' risk of flight cannot be adequately addressed, however, simply through a high secured bond and restraining orders on financial accounts. A defendant facing a significant term of incarceration might well prefer to lose his financial assets rather than his freedom. Further, defendants might easily persuade some friend or family member to lend them the money necessary to finance flight from the United States. Neither such a modest indebtedness nor forfeiture of the multi-million dollar bail bonds is likely to have long-term negative consequences for these defendants. As previously noted, they can operate their lucrative business — and, therefore, draw on its profits — from any number of overseas locations. Thus, it is apparent that significant physical as well as financial restrictions are necessary to assure defendants' appearance at trial. Indeed, the more effectively a court can physically restrain these defendants, the less important it becomes to identify and restrain each and every asset over which defendants may exercise some control in order to mitigate the risk of flight.

The physical restrictions proposed by the government and agreed to by defendants in

this case are extraordinary. Defendants would not only surrender their passports and be subject to home confinement with electronic monitoring and unannounced visits by the court's Pre-Trial Services Office; they agree to 24-hour-a-day visual surveillance of their Long Island home by on-site private security guards answerable to the court. Private security officers would also wiretap defendants' telephone, monitor their computer use, search their children when they entered and left the family home, and escort defendants on all authorized trips outside their home.

In United States v. Orena, we expressed serious reservations about the adequacy of home confinement as a substitute for detention in cases involving violent crime. 986 F.2d 628, 632-33 (2d Cir. 1993) (noting problems of adequately monitoring and staffing home confinement condition). We do not here retreat from those views. But this case is distinguishable from Orena in important respects. First, the crimes charged in Orena triggered a statutory presumption in favor of detention that the defendants were required to rebut. By contrast, in this case, the statutory presumption is in favor of release unless the government demonstrates that no conditions of release can be imposed to assure the defendants' appearance in court. Second, the home confinement proposed in this case is far more extensive than that in Orena. Notably, in this case, there will be on-site visual surveillance as well as electronic monitoring, minimizing the risk of circumvention noted in Orena. See id. Third, defendants propose to pay all costs associated with their home confinement, thus avoiding the drain on limited government resources discussed in Orena.

See id.[18] Fourth, the government itself has selected the private security firm that will conduct much of the on-site monitoring of defendants' home confinement. Thus, this is not a case in which government reservations about either the competency or integrity of a private security firm might give a court pause about the effectiveness of home confinement in deterring flight. Fifth, although the crimes at issue in this case and in Orena both involved alleged violence, the circumstances are not comparable. Defendants purportedly used violence in their home to secure the forced labor of two specific victims who are now in government protection. The government does not contend in this court that defendants' release poses a further threat to these victims or others. By contrast, the violence in Orena stemmed from a bloody crime-family war involving more than twenty street shootings in which a number of innocent bystanders were killed. It was in these circumstances that this court declined to approve defendants' home confinement as a condition adequate to ensure public safety. See id. at 632 (declining to wait to see if crime war "heats up again" before concluding that no conditions of release could reasonably protect public). Thus, there is no reason in this case to think that the proposed conditions of home confinement cannot reasonably mitigate any concerns about defendants' risk of flight.

The government's own submission to this court undermines its argument that there

---

[18]The government has not argued and, therefore, we have no occasion to consider whether it would be "contrary to principles of detention and release on bail" to allow wealthy defendants "to buy their way out by constructing a private jail." Borodin v. Ashcroft, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001). We note, however, that in the instant case defendants of lesser means, lacking the resources to flee, might have been granted bail in the first place.

are <u>no</u> conditions of release that could adequately assure defendants' presence at trial. Thus, we vacate the district court's order and remand the case for further proceedings consistent with this opinion. It is our expectation that, once the parties provide the assurances and finalize the arrangements referenced in the Appendix Agreement, the district court will enter appropriate bail release orders consistent with that agreement. If, for any reason, the district court concludes that it cannot enter such orders and if defendants decide to appeal that decision, that appeal shall be assigned to this panel. <u>See</u> <u>United States v. Jacobson</u>, 691 F.2d 110, 116 (2d Cir. 1982). Nothing in this opinion, however, is intended to limit the district court's authority in supervising defendants while on bail release.

## III.    <u>Conclusion</u>

Because the government has now identified for this court those further conditions that it deems necessary to assure defendants' attendance at trial and because defendants are willing to abide by these conditions, we conclude that the district court order of detention must be vacated and the case remanded to allow the parties to provide the assurances and finalize the arrangements referenced in the Appendix Agreement, whereupon appropriate bail release orders should be executed by the district court.

The judgment of the district court is hereby VACATED and REMANDED.

**APPENDIX**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA,

 *Plaintiff,* *

           -against-                  CR No. 07-429 (TCP)

VARSHA MAHENDER SABHNANI, and
MAHENDER MURLIDHAR SABHNANI,

                           *Defendants.*

-----------------------------------------------------------------x

**ORDER SETTING CONDITIONS OF RELEASE**

It is hereby that the defendants shall be released upon the following conditions, under

Title 18, United States Code, § 1342:

    1.    Personal Recognizance Bonds

    A.  A personal recognizance bond in the amount of $~~1~~2 million for Mahender

M. Sabhnani;

    B.  A personal recognizance bond in the amount of $2.5 million for Varsha

M. Sabhnani.

    C. The bonds shall be supported by; (a) a confession of judgment filed upon the

$1.6 million equity present in a cooperative apartment owned by the Sabhnanis located at

[address]; ~~and~~ (b) $2.9 million cash deposited in Montauk Financial, [account number] (c) all

shares of PVM International Corp. owned by the defendants; and (d) the defendants' daughter

Pooja Sabhnani will be a suretor on the bond. Th~~is~~e

---

*All noted insertions and deletions represent the government's response to this court's oral argument request for a specification of the further conditions necessary to assure defendants' appearance as required in court.

Montauk Account is completely restrained by consent and a properly filed restraining order.

      2.      Restraint of Assets-

      A.  ~~All financial~~

      A.  The Court shall appoint an independent accountant to review the defendants' assets, including but not limited to all financial accounts they and their children own or control personally or through corporations or other organizations (collectively, the "accounts"), and the independent accountant will provide the Court with an accurate summary of the status of the accounts that will include a listing of current balances and an estimated worth of the assets.

      B.  After the independent accountant has provided the Court with the above-referenced summary, all accounts and safe deposit boxes controlled by the defendants and their children shall be restrained by properly filed orders which shall permit transfers to take place for authorized business purposes, living expenses, defense costs including attorney's fees and the costs necessary to implement the conditions of home detention.  All transfers exceeding $10,000 shall be subject to the approval of the independent accountant.  The defendants shall present a list of business vendors and clients to be approved by the government to permit the authorized conduct of business.

      B~~C~~.  ~~Simultaneously with~~ Prior to the release of the defendants upon these conditions, an employee of Stroz Friedberg, the private monitoring company described below, and the independent accountant shall accompany ~~Pinky~~Pooja Sabhnani, the defendants' daughter, to examine the contents of all safe deposit boxes, inventory the contents and provide a copy of that inventory to government and defense counsel.

3. <u>Electronic Monitoring</u>

   A.  The defendants shall be held in home detention in their residence located at [address].  They will wear electronic bracelets at all times during this detention.  Pre-trial services will be allowed random access to the home.

   B.  The defendants shall pay all costs associated with electronic monitoring.  The defendants shall deposit in advance into an escrow account maintained by Hoffman & Pollok, LLP an amount equal to six weeks of electronic monitoring.  The cost of electronic monitoring shall be paid to the Pretrial Services Agency in four week intervals.  At the end of the first four weeks, and every four weeks thereafter, the defendants shall replenish the escrow account with an additional amount equivalent to the cost of four weeks of electronic monitoring.

   C.  The defendants shall be confined to the home at all times except to attend necessary medical appointments and to attend religious services once per month.  Prior to any such appointment or religious observance, defense counsel shall submit an order for the Court's signature specifying the date, time and place of such travel outside the home, with notice to the government and pretrial services, and the defendant will be accompanied by an employee of the private monitoring company, specified below.  <u>The Stroz employee will personally accompany the defendants at all times during any religious observances.</u>

   D.  The defendants hereby consent to random and unannounced searches of their home and effects by Stroz, Immigration and Customs Enforcement, and Pretrial Services.

4. <u>Additional Conditions of Home Detention</u>

A. Private Monitorship by Stroz Friedberg LLC

The conditions of home detention shall be monitored by Stroz Friedberg LLC ("Stroz") a private investigations firm with principal office located at 15 Maiden Lane, New York, New York 10038. All expenses for this ~~monitor ship~~<u>monitorship</u> shall be borne by the defendants subject to an engagement agreement signed by the defendants and Stroz Friedberg and approved by the government. The defendants shall deposit into an escrow account maintained by Hoffman & Pollok the equivalent of the costs associated with four weeks of home detention, to be replenished at each succeeding four-week interval.

B. Electronic Monitoring of Communications

i) The defendants shall maintain one hard line telephone and one hard line fax, to be electronically monitored by Stroz. This monitoring shall be done in real time by a Stroz investigator and shall be the equivalent of an electronic wiretap authorized by Court order. All conversations shall be recorded. The defendants and their children agree that all conversations shall be conducted in English. Any conversation which, in the judgment of the investigator, is suspicious shall be immediately reported directly to the Court with notice to the government and defense counsel. The parties agree that Stroz shall minimize all attorney-client conversations.

ii) The defendants and their children shall not have cellular telephones and their wireless accounts shall be closed or suspended for the duration

of the matter.

(iii)  Stroz shall monitor and record all computer activity.  Stroz will monitor and record all computer activity from a single desktop computer to be located in the basement of the residence with a single Internet connection.  <u>Stroz will provide the Court with an explanation regarding the methods of monitoring the computer activity, including but not limited to an explanation regarding whether the computer activity will be physically monitored by a Stroz agent and/or electronically monitored.  The defendants consent to all monitoring of their children's computer activity.</u>

a. <u>(iv)</u> The telephone capability of the computer will be disabled.

b. ~~The Sabhnanis will be permitted to receive facsimiles through the desktop computer, until the dedicated facsimile line has been established.~~

c. <u>(v)</u> SFI will compare images of the authorized desktop at the beginning of the assignment and at random, unannounced times, thereafter, to determine if violations of the protocol or Bail Stipulation have occurred.

C.    Travel to and from Court and other Approved Appointments

a.    The defendants shall travel from and to the Courthouse accompanied by a Stroz monitor.

<u>b.</u>    In the event the defendants have received Court approval to travel to their attorneys' offices, to medical appointments, or to a religious service, they must travel with <u>and be accompanied at all times by </u>a Stroz monitor.

D. No Access to the Home Other than Defendants, Their Four Children and Attorneys

i) No person shall be permitted access to the home other than the defendants, who shall remain confined therein as set forth in this Stipulation, their four children [names], and the attorneys for the defendants, including employees of and investigators for the attorneys. The attorneys shall provide ~~Stroz~~ the Court ex parte with an authorized list of attorneys, employees and investigators.

ii) The aforementioned children consent to be searched by Stroz surveillance agents upon entering and leaving the home.

E. Physical Surveillance

(i) Stroz shall conduct physical surveillance of the home and immediate curtillage 24 hours per day, seven days per week. The home currently has five access doors, three of which shall be sealed either by the installation of keyed locks, the keys to be in the possession of a Stroz surveillance agent, or otherwise boarded up. Stroz shall maintain one surveillance agent in the vicinity of each of the two open access doors to the home.

(ii) The home is currently alarmed and the code shall be changed so that it is known only to the surveillance agents. The alarm shall be deactivated only by the surveillance agents, whenever the children enter or leave the premises, and the alarm shall be immediately re-activated thereafter.

iii) The home has perimeter lighting which shall be illuminated at

all times after sundown and before sunrise to facilitate surveillance.

F.  Other Conditions of Release

i) The defendants and their daughters consent to temporary preventative detention in the event that agents of Stroz determine that they are attempting to flee.  The detention shall last as long as necessary for Stroz to notify law enforcement of the flight attempt. The defendants and their daughters also consent to the use of reasonable force by Stroz employees to temporarily detain them if Stroz employees determine that the defendants and their daughters are attempting to flee.  The defendants also authorize Stroz employees to possess firearms on their residence located at [address].

(ii)  Prior to the release of the defendants, they will provide the court with a sworn statement from Ashok Sabhnani, or another knowledgeable witness, that explains the financial transactions between Mahender Sabhnani and [son's name], including but not limited to the approximately $850,000 worth of international wire transfers between Ashok Sabhnani and Mahender Sabhnani, the repayment of loans by [son's name] to Ashok Sabhnani, and any accounts of Ashok Sabhnani over which Mahender Sabhnani has power of attorney.

iii) If the defendants or their children attempt to conduct business activities on a regular basis outside of the premises located at

[address], such attempt shall be deemed to be a violation of the conditions of release in this case.  Regular business activities includes establishing computers, e-mail accounts, websites, telephone lines, or regular cellular telephone communications.  All of the primary business of the defendants' corporation shall be conducted at the premises located at [address].

iv) Stroz shall report on all surveillance and monitor ship activity on a weekly basis directly to the Court with copies to the government and defense counsel.

Dated: June ~~11~~27, 2007

_____
U.S.D.J.