**UNITED STATES of America,**

**v.**

**David PIRK, Andre Jenkins, a/k/a Little Bear, Timothy Enix a/k/a Blaze, Filip Caruso a/k/a Filly, Edgar Dekay, II a/k/a Ed a/k/a Special Ed, Jason Williams a/k/a Toop, Thomas Koszuta a/k/a Kazoo, Gregory Willson a/k/a Flip, Emmett Green, Robert Osborne, Jr., Jack Wood a/k/a Jake a/k/a Snake, Ryan Myrtle, Thomas Scanlon a/k/a Tom, Glen Stacharczyck a/k/a Turbo, Sean McIndoo a/k/a Professor, Defendants,**

**Stanley Olejniczak, Defendant–Movant.**

**1:15–CR–00142 EAW**

United States District Court, W.D. New York.

Signed 08/02/2017.

Brendan T. Cullinane, Joseph M. Tripi, U.S. Attorney's Office, Buffalo, NY, Marianne Shelvey, U.S. Department of Justice/Organized Crime Section, Washington, DC, for United States of America.

Joseph· A. Agro, Thomas J. Eoannou, Andrew C. LoTempio, Emily P. Trott, Kevin W. Spitler, Michael J. Stachowski, Frank M. Bogulski, Barry Nelson Covert, Herbert L. Greenman, Barry Nelson Covert, Lipsitz Green Scime Cambria LLP, Michael S. Deal, DeMarie & Schoenborn, P.C., Terrence M. Connors, James W. Grable, Jr., Connors LLP, Lori Ann Hoffman, Tully Rinckey PLLC, Daniel C. Oliverio, Reetuparna Dutta, Patrick E. Fitzsimmons, Spencer Leeds Durland, Timothy W. Hoover, Hodgson Russ LLP, John Patrick Pieri, John Patrick Pieri, Esq., Mark J. Mahoney, Harrington and Mahoney, Lawrence J. Desiderio, Law Office of Lawrence Desiderio, Buffalo, NY, Thomas F. Keefe, Williamsville, NY, William T. Easton, Rochester, NY, A. Joseph Catalano, Niagara Falls, NY, John J. Molloy, West Seneca, NY, Cheryl Meyers Buth, Meyers Buth Law Group PLLC, Orchard Park, NY, Andrew D. Brautigam, Brautigam & Brautigam, LLP, Fredonia, NY, Mehmet K. Okay, The Okay Law Firm, Batavia, NY, for Defendants.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

## I. BACKGROUND

Defendant Stanley Olejniczak ("Defendant" or "Olejniczak") seeks revocation of the magistrate judge's detention order pursuant to 18 U.S.C. § 3145(b). (Dkt. 574). Defendant is one of 16 defendants'[1] named in a 46–count Second Superseding Indictment (Dkt. 33) ("Indictment") returned on March 16, 2016, that alleges various crimes, including a RICO[2] conspiracy in violation of 18 U.S.C. § 1962(d), Hobbs Act violations, firearm offenses in violation of 18 U.S.C. § 924(c), and various VICAR[3] counts, pertaining to the operation of the Kingsmen Motorcycle Club ("KMC"). Defendant is named in the following eight counts:

(1) Count 1 (RICO conspiracy) in violation of 18 U.S.C. § 1962(d);

(2) Count 2 (possession of firearms in furtherance of crime of violence) in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2;

(3) Count 10 (Hobbs Act conspiracy) in violation of 18 U.S.C. § 1951(a);

---

1. The Government sought detention of all 16 defendants in this case. Six defendants were released on conditions by the magistrate judge (see Dkt. 99; Dkt. 103; Dkt. 144; Dkt. 162; Dkt. 263; Dkt. 322), and this Court revoked a magistrate judge's detention order and ordered another defendant released on conditions (Dkt. 224), so that seven of the defendants have been released on conditions. The remaining nine defendants are presently detained, including two defendants who have entered guilty pleas. (See Dkt. 296; Dkt. 412).

2. "RICO" refers to the Racketeer Influenced and Corrupt Organizations Act, codified at 18 U.S.C. §§ 1961–1968.

3. "VICAR" refers to the Violent Crimes in Aid of Racketeering Activity statute, codified at 18 U.S.C. § 1959.

(4) Count 11 (Hobbs Act robbery) in violation of 18 U.S.C. §§ 1951(a) and 2;

(5) Count 12 (assault with a dangerous weapon in aid of racketeering) in violation of 18 U.S.C. §§ 1959(a)(3) and 2;

(6) Count 13 (use of a firearm during and relation to crimes of violence) in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2;

(7) Count 45 (using and maintaining the KMC South Buffalo Chapter's clubhouse for drug dealing) in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; and

(8) Count 46 (possession of firearms in furtherance of drug trafficking) in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.

(Dkt. 33).

Defendant was arrested and subsequently arraigned on March 22, 2016, at which time he was detained pending a hearing before the assigned magistrate judge, the Honorable Michael J. Roemer. This District's Probation Office prepared a Pretrial Services Report in which it concluded that Defendant presented both a risk of nonappearance and a danger, and recommended that Defendant be detained pending trial. After a hearing where both parties proceeded by proffer, Judge Roemer ordered Defendant detained by Order entered on March 29, 2016. (Dkt. 70). Judge Roemer found "by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the defendant's appearance as required, and ... by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community." (Id. at 2).

On July 26, 2016, Defendant filed a motion for release from custody pursuant to 18 U.S.C. § 3142(f) before Judge Roemer, contending that newly-available information justified Defendant's release on conditions. (Dkt. 229). On September 6, 2016, after briefing by the parties and a hearing before Judge Roemer at which Defendant's father testified, Judge Roemer denied Defendant's motion. (Dkt. 293). Then, on March 30, 2017, Defendant filed another motion for release from custody pursuant to § 3142(f) before Judge Roemer. (Dkt. 549). After briefing by the parties and a further hearing before Judge Roemer at which Defendant's daughter testified, Judge Roemer denied the motion by Decision and Order entered on April 24, 2017 (Dkt. 565).

Shortly thereafter, on May 5, 2017, Defendant filed the present motion for release from custody pursuant to 18 U.S.C. § 3145(b), requesting a *de novo* review of his detention by this Court. (Dkt. 574). The Government filed papers in opposition to the motion on May 19, 2017 (Dkt. 598), and Defendant filed reply papers in further support of the motion on June 6, 2017 (Dkt. 623). A hearing was commenced on June 13, 2017, at which the Government proceeded by proffer. (Dkt. 638). The hearing was continued on July 11, 2017, at which time the Government completed its proffer and Defendant proceeded by proffer. (Dkt. 666). The Court reserved decision at the completion of the hearing on July 11, 2017. (Id.).

## II. LEGAL STANDARD UNDER THE BAIL REFORM ACT

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, authorizes and sets forth the procedures for the release or detention of a person pending trial, sentence, and appeal. The procedures and standards for release or detention of a person pending trial are set forth at 18 U.S.C. § 3142. A defendant awaiting trial

must be released unless the release will present a risk of flight or danger, or both, and no set of conditions can reasonably protect against those risks. *See United States v. Berrios–Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (explaining that the Bail Reform Act codified "traditional presumption favoring pretrial release for the majority of Federal defendants" (quotation omitted)).

■ Although there is "only a limited group of offenders who should be denied bail pending trial," *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (citations and quotations omitted), when there is a "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) (quotations omitted).

■ In this case, due to the nature of the charges against Defendant, there is a rebuttable presumption pursuant to 18 U.S.C. § 3142(e)(3) that no condition or combination of conditions will reasonably assure the appearance of Defendant and the safety of the community if Defendant is released. *See also United States v. Contreras*, 776 F.2d 51, 54–55 (2d Cir. 1985) (holding that a grand jury indictment establishes probable cause for purposes of the rebuttable presumption under the Bail Reform Act, and when faced with an indictment, the Court does not need to make an independent finding of probable cause). The presumption shifts to Defendant "a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "[A] defendant must introduce some evidence contrary to the presumed

fact[s] in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). If a defendant satisfies this burden of production and rebuts the presumption, it does not disappear; rather, the presumption "remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.

■ Even in a presumption case, however, at all times the government retains the ultimate burden of persuasion. *Id.* The burden of proof with respect to risk of flight is preponderance of the evidence. *Id.* On the other hand, the government must demonstrate by clear and convincing evidence that a defendant should not be released due to his risk of danger. *Chimurenga*, 760 F.2d at 405. Clear and convincing evidence "means something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" *Id.* In other words, the evidence must support a conclusion of danger to the community "with a high degree of certainty." *Id.*

The statutory factors that a court must consider in deciding whether a defendant has rebutted the presumption of flight and danger, and whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, are as follows:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; ... or involves ... a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties,

employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g); *see also Mercedes*, 254 F.3d at 436 ("To determine whether the presumptions of dangerousness and flight are rebutted, the district court considers ... [the factors set forth in] § 3142(g).").

 In reviewing a detention order of a magistrate judge, a district judge should not simply defer to the judgment of the magistrate judge, but rather must reach her own independent conclusions. *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985). "When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence." *United States v. Marra*, 165 F.Supp.2d 478, 481 (W.D.N.Y. 2001).

## III. ANALYSIS

 Based upon its review of the record and the factors set forth in § 3142(g), including consideration of the rebuttable presumption of flight and danger, the Court concludes that the Government has established by a preponderance of the evidence that Defendant presents a flight risk and by clear and convincing evidence that

Defendant's release would endanger the safety of any other person and the community, and no condition or combination of conditions will reasonably protect against those risks. As a result, Defendant's motion to revoke the magistrate judge's detention order (Dkt. 574) is denied.

### Pending Charges Against Defendant

Here, Defendant is charged in eight separate counts with some very serious crimes, including a RICO conspiracy allegedly involving a pattern of racketeering activity with predicate acts of murder, robbery, kidnapping, drug trafficking, and obstruction of justice; a VICAR count involving an assault with a dangerous weapon; a Hobbs Act robbery; and three separate § 924(c) counts. Defendant faces a mandatory imprisonment term of 55 years to life if convicted at trial. (Dkt. 258 at 2).

Among the overt acts charged in the Indictment, Defendant is alleged to have been personally involved in the forcible shutdown of the Springville Chapter of the KMC on June 7, 2013. (*See* Dkt. 33, Overt Acts at ¶¶ 13–19). Although Defendant is not alleged to have personally committed the violence against "Victim B" (the Springville Chapter President), he is alleged to have otherwise participated in the incident which involved brandishing of firearms and theft of various items. (*Id.*). The Government has proffered that there is sworn grand jury testimony that Defendant was observed removing money from the room where Victim B was assaulted, and that the Government's investigation has revealed additional information that Defendant assisted with the clean-up and removal of items from the Springville clubhouse. Indeed, at least for purposes of this detention decision, Defendant appears to concede that he was involved (*see* Dkt. 229 at ¶ 13 ("[M]ost particularly, Mr. Olejniczak was never a participant in any of the

allegations contained in the indictment save for one excursion to Springville.")), although he disputes the role that he played in the incident, arguing that, in essence, he just went along with the excursion to Springville (an approximately 40–minute drive from Buffalo) because he had a truck.

In addition, Defendant is charged with a drug trafficking crime through the maintenance of the KMC South Buffalo Chapter clubhouse, which is located four minutes from his residence. (Dkt. 258 at 6). At the time of his arrest, there was evidence of smoked marijuana in an ashtray on the nightstand by Defendant's bed. The Government proffers that its investigation has revealed that Defendant and his girlfriend are involved with drugs. (See, e.g., Gov't Ex. 1 (FBI 302 indicating that former high ranking member of KMC indicated that Defendant is a cocaine dealer); Dkt. 598 at 6 (referencing FBI 302s that state that Defendant is "into using and selling pills" and "sold weed" and that his girlfriend Meredith deals cocaine)). Although the reliability of the information in those FBI 302s certainly does not rise to the level of sworn testimony, the fact is that Defendant is indicted for a drug trafficking crime (Count 45), and apparently there is no dispute that drugs and a firearm were found in close proximity to Defendant at the time of his arrest.

The Government also proffered that during the 2013–2014 time frame, a group of approximately five KMC members (including Defendant) received orders to locate co-defendant Filip Caruso ("Caruso") and harm him because he was believed to have stolen money from the KMC. The group ended up at the KMC West Side clubhouse, and although Caruso was not at that location, his dog was present. The dog was shot and killed, and then the carcass was removed, in retribution for Caruso's alleged theft and wrongdoing. The Government does not have information that Defendant actually shot the dog.

Unlike his co-defendants, Defendant is not identified as having any particular role within the KMC, other than being a member. (See Dkt. 33 at ¶ 26(k)). However, according to the Government, there is information that Defendant acted as a "de facto type of enforcer" when he belonged to the KMC Attica Chapter (that chapter apparently shut down, and Defendant became a member of the South Buffalo Chapter).

### Defendant's Criminal History

Dating back almost 20 years, Defendant has a history of incidents[4] involving violent and threatening conduct, and failure to comply with court orders.[5]

On or about May 3, 1998, Defendant was charged with assault in the second degree

---

4. The ultimate dispositions discussed in this Decision and Order do not consistently line up with the criminal history reflected in the Pretrial Services Report. For its recitation of Defendant's criminal history, the Court is relying upon the actual documentation that Defendant submitted in connection with these proceedings, at Dkt. 299.

5. The Court is expressly not taking into consideration the arrest from February 8, 1982, where Defendant was adjudicated a youthful offender and for which no documentation has been presented.

In addition, the Government cited to an incident in January 2012, where Defendant was alleged to have continuously called the complainant and his girlfriend making verbal threats that he was "going to shoot your house up, kill you, and bring Kingsman [sic]" and that he was "going to strangle your girlfriend and kill her." (Dkt. 258-3). Because there is no corroborating evidence in the record, or even any evidence of an arrest or investigation that was the result of this complaint, the Court is not taking it into consideration in connection with this Decision and Order.

(a class D felony), and the charge was ultimately resolved by a plea of guilty to attempted assault in the third degree (a class B misdemeanor). On May 27, 1998, Defendant was sentenced to a conditional discharge that required, among other things, one year of substance abuse treatment and "[n]o guns in house 1 year." (Dkt. 229–3 at 1). The felony complaint in that case indicates that Defendant caused his then-wife Valerie

> serious physical injury to wit, pain, swelling, and bruising to her head and body, loosened her teeth, bruised right ribs ... in that the defendant did beat [Valerie] ...' about the head and body causing pain, swelling and bruising to same and did also cause loosened teeth[,] a bruised right breast and bruised ribs....

(*Id.* at 2).

On February 24, 2006, Defendant was arrested for threats directed toward his then wife (Valerie), wherein it was alleged that Defendant repeatedly threatened to kill her and made at least some of these threats over the telephone in the presence of the responding police officer(s). (Dkt. 229–8). Then, on March 28, 2006, Defendant was alleged to have made more threats against Valerie (allegedly telling her that he was going to "kill her, and that he was going to take her fucking car and drag her down Main Street when she walked to work"), in violation of an order of protection. (Dkt. 229–7). Valerie reported to the police that she was scared of Defendant who had "hurt" her in the past and she did not know "what he is capable of doing." (*Id.* at 5).

On May 31, 2006, Defendant was ultimately convicted in connection with these incidents by a plea of guilty to aggravated harassment in the second degree (a class A misdemeanor) (Dkt. 229–8 at 1) and attempted criminal contempt in the second degree (a class B misdemeanor) (Dkt. 229–7 at 1). He was sentenced to a total of six months in the Niagara County jail. (*Id.* (90 days concurrent sentence for criminal contempt); Dkt. 229–8 at 1 (six months concurrent sentence for harassment)).

On February 10, 2007, Defendant was involved in another incident involving threats to Valerie, wherein he allegedly used his daughter to repeatedly make phone calls to Valerie at work, in violation of an order of protection. (Dkt. 229–6 at 2). On July 18, 2007, Defendant was convicted of a violation charge of disorderly conduct in connection with this incident, sentenced to a one year conditional discharge, and fined. (*Id.* at 1).

Then, on March 27, 2009, Defendant was charged with assault in the third degree (a class B misdemeanor) in connection with an incident involving his current girlfriend, Meredith Moore. (Dkt. 229–4). The police report prepared in connection with this incident indicates that Defendant inflicted physical injuries to his girlfriend, including

> substantial pain, swelling and bruising to her face and her body and lacerations on her chest, both arms, neck, and face ... by intentionally punching her on her face/eye area, slamming her body against the wall, pouring water and garbage on her, and slamming her against the glass on the door causing the glass to shatter.

(*Id.* at 2). The case was ultimately resolved through a guilty plea by Defendant to attempted assault in the third degree with intent to cause physical injury (a Class B misdemeanor), and on April 2, 2009, Defendant was sentenced to a conditional discharge requiring one year of "Batterer's Intervention." (*Id.* at 1).

On September 12, 2013, Defendant was allegedly involved in an incident involving a young relative of a rival motorcycle club

("the Wheels of Soul"—an African American 1% motorcycle club in Buffalo). Defendant allegedly stabbed the young man (Henry Tillman) causing a wound to the left leg and five sutures (Dkt. 229-5 at 3, 7), and he allegedly punched another individual (Jacob Toy) (*id.* at 6). Defendant was initially charged with a felony and misdemeanors as a result of this incident, but he ultimately pleaded guilty to a violation charge of harassment in the second degree. According to the Government, a proffering co-defendant informed them that the case was ultimately resolved outside the criminal justice system by an agreement between the KMC and this rival motorcycle club.

In addition, at the hearing before the undersigned in connection with the pending motion, the Government cited to invoices for gun purchases that were submitted on behalf of Defendant. Two of those invoices reflect the purchases of two separate firearms by Defendant—one that was delivered on December 16, 1998 (Dkt. 574-2 at 3), and one that was delivered on January 5, 1999 (*id.* at 4). However, pursuant to the May 27, 1998, conviction and sentence for attempted assault in the third degree, outlined above, one of the conditions of Defendant's conditional discharge was that he must have "[n]o guns in house 1 year." (Dkt. 229-3 at 1). Thus, it would appear as though Defendant violated that court order.

### Arrest of Defendant on March 22, 2016

When Defendant was arrested at his residence at 95 Jones Street on March 22, 2016, he was in bed, and right next to the bed were the following: (1) a Winchester 16 gauge single shot shotgun loaded with one shell; (2) six 16 gauge shotgun shells; and (3) smoked marijuana in an ashtray on the nightstand.

Eleven firearms were at Defendant's residence at the time of his arrest. Defendant contends that the firearms were used for hunting purposes (and indeed, Defendant owns a hunting cabin). (Dkt. 229 at ¶ 18; Moore Aff. at ¶ 7). However, the discovery of the loaded shotgun by his bed at the time of his arrest contradicts the claim that hunting was the firearms' sole purpose.

### Personal Background

Defendant is 52 years old and appears to have positive support from his immediate family. He has two adult children and is in a long-term relationship with his girlfriend, Meredith Moore. He is a lifelong resident of Western New York and has lived at his current residence for over 25 years. Although he has traveled out of the country for vacation in the past, he reported to the United States Probation Office that he does not possess a U.S. passport or any international travel document.

Defendant quit school when he was in ninth grade and does not possess a high school diploma. Before his arrest, he was unemployed and received monthly social security disability payments due to a work-related back injury in 1992. Defendant worked as a truck driver before his injury. Defendant's finances appear to be fairly limited, although he does own two properties—his home at 95 Jones Street and a hunting cabin in Dale, New York.

Defendant denied during his interview with the United States Probation Office that he used illicit drugs and/or had a history of drug or alcohol treatment. However, the marijuana found in his bedroom at the time of his arrest certainly contradicts that statement; furthermore, as part of Defendant's May 27, 1998 sentence in Buffalo City Court, he was sentenced to one year of substance abuse treatment as a part of his conditional discharge. (Dkt. 229-3 at 1).

Defendant has a number of health issues that are documented in the Pretrial Services Report. In addition, Defendant submits that he suffered a severe brain injury when he was struck by an automobile at the age of three, and since that time, he has had difficulty with comprehension. (Dkt. 229 at ¶ 9). In addition, his daughter suffers from heroin addiction and she has testified that she needs his support (although she is currently pregnant and therefore no longer using illegal drugs). (*See* Dkt. 647).

### *Defendant's Danger and Flight Risks, and the Lack of Any Reasonable Conditions*

The Court has considered all of the § 3142(g) factors, including those reflected by the information outlined above, and in view of those factors and the rebuttable presumption in this case, it is apparent that Defendant presents both a risk of flight and danger, and there are no conditions that will reasonably protect against those risks.

Defendant has a history of violating court orders—both orders of protection and the conditional discharge order requiring that he not have guns for a period of one year. He is charged with very serious crimes and faces a significant period of incarceration if convicted. The weight of the evidence in this case is strong, and while Defendant may not have engaged in the most violent conduct of all the alleged conduct charged in this case, the evidence suggests that he nonetheless has been a participant in the illegal acts of a violent motorcycle club. While the complete picture of Defendant's alleged illegal drug use is not clear, he plainly has had some involvement with illegal drugs (and, indeed, is charged in Count 45 with drug trafficking activities). He also possessed a significant number of firearms, and again,

appears to have obtained at least two firearms in violation of a court order.

Most significantly, Defendant's criminal history depicts an individual who has repeatedly engaged in violent activity. While he has not been convicted of any felony charges, his criminal history reflects an individual who has violated court orders and engaged in violent, threatening behavior. The fact that much of the criminal history included crimes against his former wife and current girlfriend does not negate the Court's reliance on and consideration of that history. The Court finds wholly without merit the argument that somehow the criminal conduct is not as significant, or not as predictive of Defendant's propensity for violence, because it was directed at intimate partners.

Defendant's family ties, and offered conditions such as electronic monitoring and posting of family property, simply are not sufficient to overcome the presumption in this case and the other factors under § 3142(g) that weigh in favor of detention. As a result, the Court concludes that Defendant has not rebutted the presumption in favor of detention, and furthermore, the Government has established by a preponderance of the evidence that Defendant should not be released due to his flight risk and by clear and convincing evidence that Defendant should not be released because of the risk of danger any release would pose. The Court concludes that no condition or combination of conditions could reasonably protect against those risks.

### IV. DEFENDANT's DETENTION IS NOT CONSTITUTIONALLY EXCESSIVE

Defendant also has argued that his continued detention is constitutionally excessive. (Dkt. 574-1 at 26-27). The Govern-

ment submitted a supplemental filing in opposition to this argument. (Dkt. 604).

In *United States v. Millan*, 4 F.3d 1038 (2d Cir. 1993), the Second Circuit discussed the framework by which a district court assesses whether pretrial detention has become unconstitutional.

> To determine whether the length of pretrial detention has become constitutionally excessive, we must weigh three factors: (i) the length of detention; (ii) the extent of the prosecution's responsibility for the delay of the trial; and (iii) the strength of the evidence upon which the detention was based, that is, the evidence concerning risk of flight and danger to the safety of any other person or the community.

*Id.* at 1043 (internal quotations and citation omitted).

 Here, Defendant has been detained since his arrest on March 22, 2016—in other words, just over 16 months. (Dkt. 76). A trial date is scheduled for January 16, 2018, at which time Defendant will have been detained about 22 months. The Second Circuit has held that detentions of this length do not violate due process. *See Millan*, 4 F.3d at 1044 (where by time of trial, the defendant will have been detained between 30–31 months without a formal finding of guilt, detention did not violate due process); *see also United States v. Rounds*, 619 Fed.Appx. 40, 41 (2d Cir. 2015) (pretrial detention lasting over five years, while "troubling," did not violate due process, where trial was scheduled to start 14 days after the defendant's appeal was submitted for consideration, reason for delay was largely the fault of the defendant, and the defendant was accused of crimes carrying a maximum penalty of life in prison); *United States v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012) (26-month pretrial detention did not violate due process, but warning district court

that it was "disturbed" by the long detention and stating that the defendant could recall the mandate if the court did not start trial by a certain date or set reasonable bail); *United States v. Hill*, 462 Fed. Appx. 125, 127–28 (2d Cir. 2012) (24 months did not violate due process, but noting that the defendant could move to recall the mandate if the district court did not begin the defendant's trial or release him on bail on or before the point at which his detention would have exceeded the 30-month period previously identified as "extraordinary"); *United States v. El–Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (30–33 month detention does not violate due process, where the defendant allegedly had a role in a worldwide terrorist organization and was dangerous to the United States, because "longer pretrial detention is more justifiable for a defendant found to be dangerous than for a defendant who presents only a risk of flight"); *United States v. El–Gabrowny*, 35 F.3d 63, 65 (2d Cir. 1994) (projected time of detention of 27 months does not violate due process, but noting that if trial was substantially delayed, the defendant could renew his motion, and stating that it "[did] not intend to suggest that [the defendant's] pretrial detention may continue indefinitely"). As a result, the length of the delay in this case, in and of itself, does not offend constitutional principles, at least at this stage of the proceedings.

In addition, nothing in the record suggests that the Government is responsible for any delay in this case; indeed, Defendant has consented to and requested extensions of time during the litigation of this matter. (*See* Dkt. 291 (seeking extension of time to file pretrial motions); Dkt. 511 (seeking to adjourn suppression hearing); Dkt. 596 (seeking extension to file papers regarding suppression motion);

Dkt. 665 (seeking extension to file papers regarding suppression motion)).

Finally, the Court has articulated above the reasons that there is no condition or combination of conditions that could reasonably protect against the risks of flight and danger that would be presented by Defendant's release.

As a result, based on a consideration of all three *Millan* factors, the Court finds that, at this stage of the proceedings, Defendant's detention has not run afoul of his constitutional rights.

## V. CONCLUSION

For the foregoing reasons, Defendant's motion to revoke the magistrate judge's detention order (Dkt. 574) is denied.

SO ORDERED.