**UNITED STATES of America Appellee,**

**v.**

**Sonia LaFONTAINE Defendant–Appellant.**

**Docket No. 00–1157**

United States Court of Appeals, Second Circuit.

Argued March 23, 2000.

Decided April 12, 2000.

Myles H. Malman, North Miami, FL, for Appellant.

Paul B. Radvany, Assistant United States Attorney for the Southern District of New York (Mary Jo White, United

Before: FEINBERG, JACOBS, STRAUB, Circuit Judges. Defendant

FEINBERG, Circuit Judge:

Defendant Sonia LaFontaine appeals from an order of the United States District Court for the Southern District of New York (Michael B. Mukasey, J.), entered on February 25, 2000, that revoked her bail and remanded her to federal custody. Appellant LaFontaine argues that (1) the district court abused its discretion in relying on the government's proffer; (2) there was no probable cause to believe that defendant committed the crimes of witness tampering and perjury while released on bail; and (3) the district court clearly erred in concluding that no conditions would assure that LaFontaine will not pose a danger to the community. This case raises some issues of first impression concerning the government's use of proffers. It also poses the question of whether obstruction of justice by a white-collar criminal, even where it does not involve violence or threat of violence, may support a finding of danger to the community. For the reasons set forth below, we affirm.

## I. Background

LaFontaine and her husband, Arthur Kissel (aka Arthur Froom), were initially indicted in March 1998. A superseding indictment in 12 counts was returned in November 1998. The present indictment, issued in October 1999, charges LaFontaine and her husband with 17 counts of mail fraud, health care fraud, engaging in monetary transactions with criminally derived property, conspiracy, and witness tampering, in connection with their activities at LaFontaine Rish Medical Associates, a cosmetic surgery clinic ("the clinic"). LaFontaine and other employees of the clinic allegedly committed health care fraud by submitting false claims to health insurers for procedures that either were not performed, were only for cosmetic pur-

poses, or were not performed by licensed physicians. LaFontaine has no criminal record. Kissel has absconded to Canada and remains a fugitive there.

### A. Events prior to the bail revocation hearing.

LaFontaine was initially arrested in March 1998 and detained at the Metropolitan Correctional Center ("MCC"). While there, LaFontaine called Ana Reyes ("Reyes Jr."), a relative [1] and a former employee of the clinic. During their conversation, LaFontaine and Reyes Jr. discussed several procedures that had been performed on Reyes Jr.'s mother ("Reyes Sr.") at the clinic. This conversation was recorded by the MCC ("MCC tape"). The government alleges that Reyes Sr. had several cosmetic operations at the clinic, including a "tummy-tuck" and liposuction, that were not covered by insurance. The clinic did not charge Reyes Sr. for these procedures; instead, it billed her insurance for other procedures, including correction of a hernia, vein treatments, lesion removals and nasal reconstruction, that were never performed. In the taped conversation, LaFontaine "reminds" Reyes Jr. of the procedures her mother purportedly received at the clinic. The MCC tape also depicts LaFontaine falsely telling Reyes Jr. that doctors were present during all the procedures that were performed. Reyes Jr., meanwhile, reassured LaFontaine that she had told authorities that her mother had a hernia operation.

A few days after LaFontaine's arrest, her initial bail was set by then-Magistrate Judge Buchwald, who imposed several pretrial release conditions. These included a prohibition on contacting doctors, former doctors, employees, former employees, or patients of the clinic, or any other potential witnesses. In addition, LaFontaine posted a one million dollar personal surety bond.

In August 1998, one of LaFontaine's former lawyers, Lothar Genge, requested a modification of the bail conditions to allow LaFontaine to speak with Reyes Jr. as well as with other employees and patients of the clinic. The government refused to consent to this modification and Judge Mukasey denied the request.

### B. The bail revocation proceeding.

On February 18, 2000, the government submitted a letter proffer to the district court requesting revocation of bail on two grounds: first, there was clear and convincing evidence that LaFontaine had violated the conditions of her release by contacting Reyes Jr.; and second, there was probable cause to believe that LaFontaine had also committed the crime of witness tampering by attempting to influence Reyes Jr.'s testimony.[2]

The letter set forth in great detail the evidence the government was prepared to proffer at the hearing on its motion. It alleged that, despite the bail conditions, LaFontaine and Reyes Jr. met on several occasions in 1999, and that LaFontaine often treated Reyes Jr.'s children to meals and gifts, which was not her previous custom. Among other things, the letter charged that at some time in 1999 LaFontaine invited Reyes Jr. to her house and played the MCC tape for her. At that time, LaFontaine asked Reyes Jr. to "remind" her mother that she had a hernia operation and a procedure on her nose at the clinic, even though LaFontaine knew that to be false. According to the government, LaFontaine was then aware that Reyes Jr. was likely to be a government witness at the trial. The letter also alleges that while Reyes Sr. was a patient at the clinic, LaFontaine had told her to lie about what procedures were actually performed on her. Additionally, the letter alleges that LaFontaine's husband sent

---

1. Reyes Jr. is the mother of LaFontaine's great-niece.

2. The letter was submitted to the court ex parte because the government feared that de-

fendant might flee if she learned of the government's motion.

Reyes Sr. a fraudulent set of medical records that reflect LaFontaine's statements to Reyes Jr. The government also claimed that LaFontaine provided Reyes Jr. with the name and address of another employee of the clinic whom LaFontaine wanted to contact in connection with this case. The letter was accompanied by a transcript of the MCC tape and an affidavit of a government attorney describing LaFontaine's previously rebuffed efforts to obtain permission to contact Reyes Jr.

The district court held hearings on the government's motion to revoke bail on February 22, 23, and 25, 2000. Both sides had the opportunity to present argument and evidence to the court. In addition to its letter proffer, the government also orally proffered evidence of what it characterized as defendant's long history of obstruction in this case. According to the government, LaFontaine had shredded documents, attempted to contact other witnesses, and intimidated a doctor at the clinic. Indeed, the superseding indictments charged her with the tampering of another witness in this case. The government argued that there was danger of future obstruction by LaFontaine, both of Reyes Jr. and other (unnamed) witnesses. The government also argued that because its proffers revealed the extent of the evidence it had against LaFontaine, she now presented a flight risk. Finally, following the second day of hearings and in response to evidence offered by LaFontaine, the government submitted an additional letter, dated February 24, 2000, showing that there was probable cause to believe that LaFontaine lied when she stated in an affidavit to the court that she did not possess a copy of the MCC tape.

LaFontaine's response to the government's proffer consisted of two of her own affidavits, an affidavit from her husband, and an affidavit from her husband's law-

yer. LaFontaine also called two of her prior defense attorneys, Lothar Genge and Richard Wojszwilo, as witnesses. In her first affidavit to the court, dated February 23, LaFontaine stated that "any contact I may have had with Ana Reyes [Jr.] was strictly in a familial and social context, and I never attempted or did threaten, intimidate or try to influence her testimony or that of her mother." Specifically, LaFontaine claimed that there was no "sinister" motivation behind her generosity to Reyes Jr.'s children as she was related to them. She also disputed the allegation that she played the MCC tape for Reyes Jr. or even possessed the tape.[3] LaFontaine denied that her conversation with Reyes Jr. constituted witness tampering because, she maintained, Reyes Sr. did have the procedures that were discussed. To support this contention, LaFontaine submitted hospital records showing that Reyes Sr. had a hernia operation at Yonkers General Hospital. Finally, LaFontaine argued that as she believed Reyes Jr. was her own witness, she had no reason to harass, intimidate, or influence her testimony. LaFontaine's counsel, Genge, testified that to his knowledge Reyes Jr. and the defendant did not meet alone; that he listened to the MCC tape at defendant's apartment; and that he did not believe the tape to be very significant.

On the second day of hearings, the government revealed that Reyes Jr. was the source of its proffer and that she had previously lied to the grand jury and to government investigators. Because of this disclosure, LaFontaine's counsel repeatedly requested the district court to direct the government to call Reyes Jr. to testify. LaFontaine's counsel argued that the government's proffer was unreliable because of Reyes Jr.'s perjury. Further, he argued that this revelation was surprising as LaFontaine had anticipated that Reyes Jr.

---

**3.** Although LaFontaine denied possessing the tape, in her second affidavit to the court, dated February 24, she admitted transferring boxes containing her legal files from one at-

torney to the other. According to the testimony of Wojszwilo those boxes probably contained the MCC tape.

would be a defense witness. The district court denied the request.

## C. The district court decision.

On February 25, the judge ruled in open court on the government's motion to revoke bail. The judge accepted the government's proffer and concluded that (1) LaFontaine contacted a government witness in direct violation of the district court's order; (2) there was probable cause to believe that LaFontaine made materially false statements in her affidavits to the court; and (3) there was probable cause to believe that LaFontaine committed the crime of witness tampering under 18 U.S.C. § 1512(c)(2). The judge did not credit Genge's testimony, finding that he disobeyed the court order prohibiting any association between Reyes Jr. and LaFontaine and that he was too willing to exculpate his client. The judge concluded that under 18 U.S.C. § 3148(b):

> the presence of probable cause to believe that the defendant committed a federal crime while on release creates a rebuttable presumption that no condition or combination of conditions will assure that the defendant will not pose a danger to the community. That presumption exists and has not been rebutted.

After considering whether to limit defendant to house arrest with other additional precautions, e.g. electronic monitoring, phone tap, the district court concluded that "the latest disclosure of a false statement direct[ed] to the court reveals a level of desperation by this defendant that I believe counsels in favor of continued confinement...." At the close of the hearing, the judge ordered that bail be revoked and scheduled the trial to begin on June 5, 2000.

This appeal followed.

## II. Discussion

### A. Relevant statute and standard of review.

 A district court may revoke an order of release under 18 U.S.C. § 3148(b)

if, after a hearing, the court determines either that there is "probable cause to believe that the person has committed a Federal, State, or local crime while on release," or that there is "clear and convincing evidence that the person has violated any other condition of release." § 3148(b)(1)(A)-(B). In addition, the district court must find that "there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community," or that "the person is unlikely to abide by any condition or combination of conditions of release." § 3148(b)(2)(A)-(B). As Judge Mukasey noted, the statute also creates a rebuttable presumption that "[i]f there is probable cause to believe that, while on release," the defendant has committed a felony, there is no set of conditions that will assure that "the person will not pose a danger" to the community. § 3148(b)(2). That presumption does not disappear once the defendant has produced some rebuttal evidence, but "continues to be weighed along with other factors." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir.1991). As we stated in *United States v. Gotti*, "unless we believe that the findings of the district judge were clearly erroneous or that he committed an error of law, we should affirm" the district court's order of detention or release. 794 F.2d 773, 778 (2d Cir.1986); see also *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir.1995) (noting that the scope of review may be "slightly broader with respect to the 'ultimate determination' that defendant does, or does not, present a risk to the citizenry"). We review the district court's determination that a package of bail conditions will prevent danger to the community for clear error. See *Ferranti*, 66 F.3d at 542.

### B. The government's proffer.

 As described above, the government proceeded almost entirely by proffer: its two letters to the court as well as its

oral proffer to the court during the revocation hearings.[4] It is well established in this circuit that proffers are permissible both in the bail determination and bail revocation contexts. See *id.* (bail determination); *United States v. Davis*, 845 F.2d 412, 415 (2d Cir.1988) (bail revocation). In *Davis*, this court stated that "it would [not] be an abuse of discretion for the district court to permit the government to proceed by proffer alone." *Id.* at 415.

■ As in the case of other pretrial proceedings such as arraignments and "probable cause" determinations for warrants, bail hearings are "typically informal affairs, not substitutes for trial or even for discovery. Often the opposing parties simply describe to the judicial officer the nature of their evidence; they do not actually produce it." *United States v. Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir.1985) (Breyer, J.); see also *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir.1986) (bail hearing cannot become a "mini-trial" or "a discovery tool for the defendant"). Nevertheless, this court has also recognized that while the informality of bail hearings serves the demands of speed, the magistrate or district judge must also ensure the reliability of the evidence, "by selectively insisting upon the production of the underlying evidence or evidentiary sources where their accuracy is in question." *Martir*, 782 F.2d at 1147 (emphasis omitted) (quoting *Acevedo-Ramos*, 755 F.2d at 207). In *Martir*, a case where the government argued that defendant posed a risk of flight and proceeded solely by proffer, we stated that "[i]n the informal evidentiary framework of a detention hearing, the methods used to scrutinize government proffers for reliability must lie within the discretion of the presiding judicial officer, informed by an awareness of the high stakes involved." *Id.* at 1147. In that case, we criticized the government's proffer for simply stating in "general and con-

clusory terms what it hoped to prove," for failing to refer to any "independent evidence, such as tapes, documents, or photographs," and for failing to furnish any testimony or affidavits. *Id.* However, because the defendant in *Martir* did not object to the proffer, we did not find that the district judge erred in relying on it.

■ LaFontaine claims that here the district court did not appropriately balance the need for speed and reliability because the government's proffer relied solely on the proffered testimony of Reyes Jr. who, earlier in the investigation, had lied to the grand jury as well as to government investigators. We disagree. That the primary witness for the government's proffer had previously perjured herself, in and of itself, did not so undermine the credibility of the proffer as to justify refusing it. The government truthfully stated in open court that Reyes Jr. had previously lied to the grand jury. Reyes Jr.'s perjury, the government argued, did not undermine the proffer, but demonstrated that LaFontaine was successful in delaying this witness's truthful testimony. Further, the government proffered evidence of LaFontaine's past obstruction which apparently came from sources other than Reyes Jr. In any event, it is inaccurate to characterize the court's decision as based solely on the government's proffer. Here, unlike in *Martir*, the proffer was corroborated by extrinsic evidence such as the MCC tape. Further, it is quite clear from the record that the proffer was not contradicted by the testimony of LaFontaine's witnesses. In light of this record, we cannot say that Judge Mukasey abused his discretion in accepting the proffer and denying defendant's request to call Reyes Jr. to testify at the hearings.

■ LaFontaine also contends that the proffers here should have been rejected because she was not accused of any

4. An important exception is, of course, the transcript of the MCC tape, which the govern-

ment attached to its February 18 letter.

violent or threatening behavior towards the witnesses. It is true that, as LaFontaine points out, in most bail determination cases that have come before us where detention was premised on a showing of danger to the community, the government usually *has* called witnesses and *has not* relied primarily on a proffer. See, e.g., *Ferranti*, 66 F.3d at 542–43 (government proceeded by proffer and other evidence including the testimony of an FBI agent); *Gotti*, 794 F.2d at 775 (government called 12 witnesses in the bail revocation hearing); *United States v. Grisanti*, No. 91–229A, 1992 WL 265932, at *2 (W.D.N.Y. Apr.14, 1992) (government called probation officer as witness). Nevertheless, we do not believe that it follows from this that the district court here could not accept the proffer. First, the government did argue that LaFontaine had intimidated some individuals related to this case, although admittedly her actions were not as egregious as those described in the above-cited cases. More importantly, we see no persuasive reason to distinguish between violent and nonviolent obstruction for the purpose of determining whether proffers are an acceptable method of proof. As will be seen below, witness tampering by either means has supported detention or revocation of bail. Rather, the question for the district court is whether the government has produced sufficient evidentiary support for its motion. Cf. *Martir*, 782 F.2d at 1147 (the court should insist on the production of underlying evidence where accuracy of proffer is in question).

In sum, we do not believe that Judge Mukasey abused his discretion in accepting the government's proffer.

## C. Review of the district court's findings.

LaFontaine argues that there was no probable cause to believe that her contacts with Reyes Jr. constituted witness tampering under 18 U.S.C. § 1512(b) or that her sworn affidavit concerning her possession

of the MCC tape constitutes perjury under 18 U.S.C. § 1621.

### 1. Witness tampering.

■ Witness tampering occurs when a person "knowingly ... corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—(1) influence, delay, or prevent the testimony of any person in an official proceeding." § 1512(b). Judge Mukasey found that: (1) the MCC tape "showed defendant seeking to persuade the younger Reyes to give an account consistent with defendant's position but inconsistent with the truth;" (2) LaFontaine met Reyes Jr. in 1999, in direct violation of the district court's order of release on bail, and based on the government's proffer it is likely that LaFontaine played Reyes Jr. the tape of their MCC conversation; and (3) the hospital records LaFontaine produced in order to establish that Reyes Sr. actually had the medical procedures LaFontaine claims she had "do nothing to dispel the dubious nature of the conversation on the tape or the government's proffer."

As for Judge Mukasey's first finding, LaFontaine argues that her conversation with Reyes Jr. could not constitute tampering because there is no evidence of influence, harassment or intimidation of Reyes Jr., and furthermore, there is evidence that LaFontaine spoke truthfully. Further, LaFontaine argues that even if that conversation did constitute tampering, it cannot serve as a basis for revoking bail because it took place while LaFontaine was detained at the MCC, before she was released on bail.

■ We agree with LaFontaine that her initial conversation with Reyes Jr. at the MCC cannot, by itself, support a finding that "there was probable cause to believe that the person has committed a Federal ... crime while on release," for the simple reason that the conversation took place before she was on release. This does not mean, however, that the conver-

sation did not constitute witness tampering. Nor does it mean that it cannot be considered in assessing LaFontaine's later conduct. After she was released, LaFontaine invited Reyes Jr. to her home and played the MCC tape for her. At that point, LaFontaine's attempt to review the "facts" that would likely become part of Reyes Jr.'s trial testimony does satisfy the requirements of the witness tampering statute and, consequently, of the bail revocation statute. Probable cause under § 3148(b)(1)(A) requires only a "practical ... probability" that the evidence supports a finding "that the defendant has committed a crime while on bail." *Gotti*, 794 F.2d at 777 (citation omitted). We cannot say, in light of the record, that Judge Mukasey erred in concluding that there was "practical probability" to find that defendant violated the law. Also, LaFontaine's argument that the tape does not show any threats or intimidation of Reyes Jr. does not take her very far. The witness tampering statute plainly does not require "physical force" or "threats" to support a tampering charge; corrupt influence is sufficient. § 1512(b)(1).

LaFontaine's objections to the judge's second and third findings require little discussion. LaFontaine admitted that she met with Reyes Jr. socially, and had met with her at least once in the presence of Genge, her attorney, in clear violation of Judge Mukasey's order. We also reject LaFontaine's claims that the judge erred in discounting the hospital documents produced by her to rebut the charge that her statements about the treatments received by Reyes Sr. are false. The basis for the judge's view of these records was that the information they contained came from an individual who participated in the scheme at issue in this case. It was not clear error for the judge to so conclude.

2. Perjury.

■ Turning to the perjury charge, Judge Mukasey found that "there was probable cause to believe that the defen-

dant had perjured herself when she swore [in her February 23 affidavit] that she 'never possessed' a copy of the [MCC tape]." In that affidavit, LaFontaine stated "I specifically deny ever playing for Ana Reyes an audio tape of my telephone conversation from prison, as the Government alleged I have done. In fact, I have never possessed a copy of this tape." The government's proffer, however, stated that it had evidence that LaFontaine did play Reyes Jr. a copy of this tape. Additionally, Genge testified that he played the MCC tape at LaFontaine's apartment and could not recall where he got the tape. LaFontaine's other counsel, Wojszwilo, testified that LaFontaine picked up cartons containing the tape among other materials from his office. LaFontaine then submitted a rebuttal affidavit in which she admitted transferring boxes containing her files, but denied retrieving the MCC tape from them. In light of this record, the court did not err in concluding that there was probable cause to believe that LaFontaine had perjured herself.

■ Finally, we note that although the district court relied on § 3148(b)(1)(A) (probable cause to believe defendant committed a crime while on release) in revoking bail, the record also supports a finding that there was "clear and convincing evidence that the person has violated [a] condition of release" under § 3148(b)(1)(B)— the alternative basis on which the government moved to revoke bail here. In his colloquy from the bench, Judge Mukasey noted that he found that LaFontaine met with Reyes Jr. in violation of her release conditions. Thus, even if there was no probable cause to believe that LaFontaine committed witness tampering or perjury, the district court's decision may be affirmed on the ground that there was clear evidence showing that LaFontaine violated a condition of her release.

D. Danger to the community.

■ A district court revoking bail must also make a finding that "there is no condi-

tion or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community." § 3148(b)(2)(A). We have stated that the government's burden under § 3148(b)(2) is to prove by a preponderance of the evidence that no condition of release will prevent danger to the community. See *Gotti,* 794 F.2d at 778. In cases where there is probable cause to believe that the defendant has committed a felony while on release, a presumption arises that no set of conditions will assure that the person will not pose a danger to the community. See § 3148(b)(2).

In a colloquy from the bench, Judge Mukasey stated that LaFontaine did not rebut the presumption, raised by the government's proffer of her witness tampering and perjury, that she posed a danger to the community. Although Judge Mukasey admitted that he was "tempted ... to limit defendant's custody to house arrest with certain additional precautions," he concluded that defendant's perjury to the court during the revocation hearing "counsel[ed] in favor of continued confinement."

On appeal, LaFontaine argues that a finding of dangerousness in her situation is not justifiable even assuming that she has attempted to influence a witness. Unlike the defendants in other cases where witness tampering was found to constitute a danger to the community, LaFontaine is a white-collar criminal with no connection to the mob, see, e.g., *Gotti,* 794 F.2d 773, or to narcotics, see, e.g., *United States v. Millan,* 4 F.3d 1038 (2d Cir.1993), *United States v. Payden,* 768 F.2d 487 (2d Cir. 1985). Further, in LaFontaine's situation the evidence of tampering does not include either actual violence or threats of violence against any trial witnesses. Cf. *Millan,* 4 F.3d at 1047–48 (threats to witnesses' families); *Davis,* 845 F.2d at 413 (potential witness shot, other witnesses recanted under suspicious circumstances); *Gotti,* 794 F.2d at 778 (threatening phone calls to witness); *Payden,* 768 F.2d at 490 (at-

tempt to have witness killed). Rather, at most the evidence shows that LaFontaine persistently "fed" Reyes Jr. false testimony with the expectation that she would adopt it.

We find that LaFontaine's claim does not withstand analysis under the case law in this circuit. Although LaFontaine's case is somewhat unusual in that there are no allegations of violence or threats aimed against witnesses, we do not find that to be determinative on the issue of "danger to the community." First, we have held that a record of violence or dangerousness in that sense is not necessary to support pretrial detention. See *Ferranti,* 66 F.3d at 543; *Rodriguez,* 950 F.2d at 89. Second, obstruction of justice has been a traditional ground for pretrial detention by the courts, even prior to detention for dangerousness which was instituted by the Bail Reform Act of 1984. See, e.g., *United States v. Melendez–Carrion,* 790 F.2d 984, 1002 (2d Cir.1986) (although the court was skeptical of the constitutionality of pretrial confinement for general dangerousness, it noted that detention may be validly imposed where there is evidence of witness tampering); *Payden,* 768 F.2d at 490 (applying the Bail Reform Act of 1966 and noting that the court had the power to detain defendant "if it found that his release posed a serious threat to the court's processes"); *Acevedo–Ramos,* 755 F.2d at 207 (noting that the 1984 Act extends the scope of pretrial detention beyond risk of flight and obstruction of justice).

In *Gotti,* we held that a single incident of witness tampering constituted a "threat to the integrity of the trial process, rather than more generally a danger to the community," and was sufficient to revoke bail. 794 F.2d at 779 n. 5. The *Gotti* court reasoned that pretrial detention was even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness. See *id.*; see also *Millan,* 4 F.3d at 1048 (wit-

ness intimidation is the type of activity that supports a finding of danger to the community); *Grisanti*, 1992 WL 265932, at *6–7 (witness intimidation supports a conclusion that defendant cannot be trusted to comply with the court's directions). Although witness tampering that is accomplished by means of violence may seem more egregious, the harm to the integrity of the trial is the same no matter which form the tampering takes. Consequently, we reject LaFontaine's contention that her attempts to influence the testimony of Reyes Jr., among others, does not constitute the type of danger to the community that would support detention.

Finally, LaFontaine argues that it was error for the court to conclude that conditions of home confinement, electronic monitoring, phone tap, and relocation to Florida, would not assure her future compliance with the court order not to contact any witnesses. The government responds that LaFontaine's past circumvention of court orders demonstrates that pretrial monitoring is not sufficient. The government presented evidence that defendant has a cell phone and uses it regularly; that she has attempted to obtain the phone number of another potential witness in the case; that she has intimidated a doctor involved in this action; and that she has shredded documents.[5] We have held that the "sort of electronic surveillance suggested by the defendants ... can be circumvented. Home detention and electronic monitoring at best elaborately repli-

cate a detention facility without the confidence of security such a facility instills." *Millan*, 4 F.3d at 1048–49 (citations and quotations omitted). Although we—like the district court—deem this aspect of the case a close call, given our deference to the court's findings and LaFontaine's disregard of the court's previous orders, we cannot say that the court's determination that no conditions would assure the safety of the community was clear error.[6]

In sum, we conclude that the district court did not err in revoking defendant's bail.[7] We have considered all of defendant's remaining arguments and find them to be without merit. The order of the district court is affirmed.

---

5. The government also argued that, in light of the evidence produced by the government at the revocation hearing, defendant now presented a flight risk as she became aware of the strength of the government's case. The district court did not reach this issue; nor do we.

6. We note as well that the district court could have revoked bail on the ground that "the person is unlikely to abide by any condition or combination of conditions of release." LaFontaine had previously disregarded court orders to stay away from Reyes Jr. and her latest violation of the trial process, as demonstrated by her perjury, would tend to suggest

that she would do so again. See, e.g., *Grisanti*, 1992 WL 265932, at *7 (court did not trust defendant, who contacted witness in the case and who lied about it to authorities, to comply with the court's directions).

7. The parties have represented to us that trial is scheduled for June 5, 2000. If the trial is postponed at the request of the government, we note that defendant may renew her motion for release without prejudice. Cf. *United States v. Salerno*, 794 F.2d 64, 79 n. 2 (2d Cir.1986) (Feinberg, J., dissenting), rev'd, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).