WILLIAM F. KUNTZ, II United States District Judge
On January 8, 2019, the defendant Jean Boustani ("Defendant") filed a motion for appeal of Magistrate Judge Peggy Kuo's Order of Detention filed on January 2, 2019. Magistrate Judge Kuo, finding Defendant failed to present credible sureties to ensure his appearance and the safety of the community, ordered detention and granted leave to renew the bail application. This Court held oral argument on the motion on January 22, 2019. For the reasons stated below, Defendant's appeal is DENIED.
BACKGROUND
On December 19, 2018, the United States of America (the "Government") filed a four-count indictment (the "Indictment") charging Defendant and others in connection with a $ 2 billion fraud, bribery, and money laundering scheme. The Indictment charges Defendant with the following crimes: (1) conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 ; (2) conspiracy to commit securities fraud in violation of 18 U.S.C.§ 371 ; and (3) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). See Indictment, ECF No. 1. The Government alleges Defendant "was a central organizing figure in a $ 2 billion fraud, bribery and money laundering scheme that resulted in the payment of at least S200 million in bribes and kickbacks to government officials in Mozambique and to investment bankers." Gov.'s's Opp'n to Def.'s Renewed Appl. for Bail ("Gov.'s Opp'n") at 1, ECF No. 27.
Defendant is, at 40 years of age, a wealthy international businessman. He is a citizen of Lebanon, Antigua, and Barbuda and has no ties to the United States. On January 2, 2019, Defendant, while en route to the Dominican Republic with his wife, was arrested by Dominican authorities and transferred to the United States, pursuant to the Indictment. He was arraigned later that day before Magistrate Judge Kuo and presented a bail application consisting of $ 2 million dollars cash and a dollar amount on the bond to be determined by the Court. January 2, 2019 Minute Entry, ECF No. 15. The Government opposed Defendant's bail application based on risk of flight. Id. After hearing argument from both parties, Magistrate Judge Kuo ordered detention and granted Defendant leave to renew his bail application. See id. ; Order of Detention, ECF No. 16.
*250 In a letter dated January 8, 2019, Defendant filed a motion appealing this detention order to the district court. Def.'s Renewed Appl. for Bail ("Def.'s Appeal"), ECF No. 21. The Government filed its opposition brief on January 16, 2019. See Gov.'s Opp'n. Defendant filed its reply brief on January 18, 2019. See Def.'s Reply in Support of Renewed Appl. for Bail ("Def.'s Reply"), ECF No. 29. This Court then heard oral argument on the application on January 22, 2019. The Court further directed the parties to submit proposed findings of fact and conclusions of law.
The defense now proposes the following bail conditions:
• A $ 20 million personal recognizance bond, secured by $ 1 million cash
• Travel restricted to the Eastern and Southern Districts of New York;
• Surrender of all travel documents with no new applications[1] ;
• Surrender of all travel documents of Defendant's wife to the FBI, with no new applications;
• Strict supervision by Pretrial Services;
• Home confinement with GPS monitoring to be secured by security company Guidepost Solutions[2] , along with additional restrictions:
? 24-hour armed former or off-duty law enforcement officers;
? Two officers per shift;
? One supervisory security professional overseeing and scheduling the security detail, who shall take directions from, and reports to, the Government and Pretrial Services;
? Surveillance and security technology[3] throughout the residence;
? Visitors limited to Defendant's attorneys and his immediate family except upon application to Pretrial Services and the Government;
? Travel limited to Court appearances and to counsel's office, except upon application to Pretrial Services and the Government, with two officers to accompany Defendant during all such travel;
? A security vehicle and driver for travels to Court or to counsel's office, when needed;
? Security personnel posted at the residence whenever Defendant leaves the unit; and
? Communication between Guidepost and Pretrial Services, the Court and/or the U.S. Attorney's Office, if required by the Court. Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s Mem.") Ex. A ¶ 5, ECF No 36-1.
Defendant also signed a declaration consenting to any and all actions taken by Guidepost, including the use of force, and *251 waiving his right to bring any action against Guidepost, the Court, the United States Government, and/or any other party in connection with any risks or dangers associated with his release. See Def.'s Mem. Ex. 4.
In support of its bail proposal, the defense argues: "Given the proposed bail conditions render it impossible for [Defendant] to flee, there is no lawful basis for his continued detention." Def.'s Appeal at 15.
The Government opposes pre-trial release, arguing: "the defendant is a flight risk with access to significant financial resources and no ties to the United States, and no condition or combination of conditions of release can reasonably assure the appearance of the defendant." Gov.'s Proposed Findings of Fact and Conclusions of Law ("Gov.'s Mem.") at 1, ECF No. 35.
LEGAL STANDARDS
The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required." U.S. Const. amend. VIII. It does not create a right to bail; rather, it prohibits excessive bail. See United States v. Salerno , 481 U.S. 739, 754-55, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Under the Bail Reform Act, a court must order pre-trial release of a defendant on a personal recognizance bond if such release will "reasonably assure the appearance of the [defendant] as required and will not endanger the safety of any other person in the community." 18 U.S.C. § 3142(b) (2018). Thus, if no condition or combination of conditions will reasonably assure the defendant will not flee or will not endanger others, a court must order detention. Id.
A district court reviews de novo a magistrate judge's decision to release or detain a defendant pending trial. See United States v. Esposito , 309 F.Supp.3d 24, 30 (S.D.N.Y. 2018) (Marrero, J.) (citing United States v. Leon , 766 F.2d 77, 80 (2d Cir 1985) ). A district court undertakes a two-step inquiry when evaluating an application for bail. See 18 U.S.C. § 3142(e). First , the Court must determine whether the Government has established the defendant presents a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e). Second , if the Government meets its initial burden, the Court must determine whether no conditions or combination of conditions of release could reasonably assure the defendant will not flee or will not endanger others. See United States v. Sabhnani , 493 F.3d 63, 75 (2d Cir. 2007). In making that determination, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person in the community that would be posed by the person's release. See 18 U.S.C. § 3142(g).
The Government must support a finding of dangerousness by clear and convincing evidence, see United States v. Ferranti , 66 F.3d 540, 542 (2d Cir. 1995), and a finding of risk of flight by a preponderance of the evidence, see United States v. Jackson , 823 F.2d 4, 5 (2d Cir. 1987) ; see also United States v. Abuhamra , 389 F.3d 309, 320 n.7 (2d Cir. 2004). Because the "rules concerning admissibility of evidence in criminal trials do not apply" to bail hearings, see 18 U.S.C. § 3142(f)(2)(B), the parties may proceed by way of proffer, United States v. LaFontaine , 210 F.3d 125, 130-31 (2d Cir. 2000). As such, courts often base detention decisions on hearsay evidence.
ANALYSIS
The Government argues Defendant poses a serious flight risk such that no combination *252 of conditions could reasonably assure his appearance in this proceeding. For the reasons discussed below, the Court agrees.
I. The Government Has Demonstrated Defendant's Risk of Flight
Because the Government does not argue Defendant's release poses a danger to the community, the Court considers each of the 18 U.S.C. § 3142(g) factors (the "bail factors") in turn, other than 18 U.S.C. § 3142(g) (danger posed by Defendant's release). In this Court's view, the bail factors support continued detention rather than release by a preponderance of the evidence.
A. The Nature and Circumstances of the Offenses
The defense asserts federal fraud charges, though "serious," are not the type of dangerous or obstructive criminal activity that demand long-term pretrial detention. According to the defense, "white-collar fraud defendants are almost always released on bail prior to trial, unless there is specific evidence that the defendant is willing to subvert the justice system or otherwise cannot be trusted to comply with the Court's orders." Def.'s Appeal at 8-9.
According to the Government, Defendant and his employer, Privinvest, are at the center of a $ 2 billion fraud, bribery, and money laundering scheme. The Indictment alleges the $ 2 billion in loan funds went to Privinvest, and Defendant personally received $ 15 million for his role in the scheme. Indictment ¶¶ 24-26. Defendant and his co-conspirators allegedly orchestrated and paid bribes and kickbacks, procured secret government guarantees, and bloated borrowing and lending by corrupt government officials and bankers. Gov.'s Opp'n. at 7. These actions resulted in staggering losses to not only foreign, but American investors, and devasted the economy of Mozambique, causing "Mozambican companies and the Mozambican government [to default] on $ 2 billion in loans and ... miss[ ] more than $ 700 million in loan payments." Id. If convicted, Defendant faces a cumulative statutory maximum of 55 years imprisonment. In sum, the Government argues "this serious potential sentence," "the staggering losses to investors," and "the real world effect of the defendant's actions" highlight the seriousness of this case. Id.
The federal fraud charges, which implicate devasting loss amounts upwards of $ 2 billion, are indeed serious. Moreover, Defendant is not just alleged to be a participant, but the principal figure in a fraud, bribery, and money laundering scheme of international proportions. As this Court has observed, a defendant's "alleged ties to a large [ ] syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction" favors denying bail. Moreover, if convicted, Defendant will face lengthy and onerous maximum penalties. When faced with the possibility of a significant prison term, defendants have a strong incentive to flee. See Sabhnani , 493 F.3d at 66-67, 76 (noting defendants had a strong motive to flee in part because they were charged with a serious crime and, if convicted, they would likely face a lengthy sentence of incarceration-a statutory maximum of 40 years imprisonment and a Guidelines range of 210 to 262 months); see also United States v. Khusanov , 731 F. App'x 19, 21 (2d Cir. 2018) (summary order) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee.") Accordingly, the Court concludes the nature and circumstances of the offenses favor detention.
*253 B. The Weight of the Evidence
The defense argues the Government fails to proffer sufficiently strong evidence against Defendant. According to the defense, the Indictment focuses on evidence of bribes paid to co-conspirators and false statements made to investors, which do not support the allegations of wire fraud, securities fraud, and money laundering charged against Defendant. Def.'s Reply at 7. The defense also asserts Defendant has strong extraterritoriality and willfulness defenses. Because the Indictment, as the defense characterizes it, "does not allege that any securities transaction occurred in the United States" and "fails to set forth with any specificity the Government's allegation as to the defendant's domestic conduct," applying the federal fraud and money laundering statutes to the defendant's extraterritorial conduct would be a violation of his Fifth Amendment right to due process. Def.'s Reply at 21.
The Government argues the overwhelming evidence against the defendant favors his detention because it provides him with a motive and incentive to flee. The Government has proffered numerous emails sent by Defendant that allegedly show he participated in an agreement to pay $ 50 million in bribes, instructed kickback payments to investment bankers, and planned and executed a money laundering scheme involving false invoices to mask payments to co-conspirators. See Gov.'s Opp'n at 8. The Government has also gathered correspondent bank records confirming these alleged bribes and kickbacks in fact occurred. See Gov.'s Mem. at 16. As an example, the Government references an email exchange showing a "a thinly-veiled reference to bribes," in which a Mozambican government co-conspirator requested '50 million chickens,' and the defendant responded, 'LOLLLLL. I love your chicken bro. Done.' " Indictment ¶ 32(a) ). This "arrangement" ultimately resulted in $ 50 million in bribes paid to Mozambican government officials according to the Government. Gov.'s Mem. at 5.
Because it is "contrary to our legal system to impose punishment for a crime that a defendant has not yet been shown to have committed," courts are cautious in affording undue weight to this factor. See United States v. Motamedi , 767 F.2d 1403, 1408 (9th Cir. 1985) (Kennedy, J); see also United States v. Paulino , 335 F.Supp.3d 600, 613 (S.D.N.Y. 2018) (Carter, J.). At this early stage in the proceedings, the Court makes no conclusions about the merits of the Government's case. See United States v. Zarrab , 15-CR-867, 2016 WL 3681423, at *7 (S.D.N.Y. July 16, 2016) (Berman, J.) ("The Court recognizes the difficulty inherent in assessing the Government's case before trial, and is mindful not to reach any conclusions about [Defendant's] guilt or innocence." (internal citation and quotations omitted) ). But significant evidence, including extensive documentation, of a defendant's role in a crime may weigh against release. See United States v. Fishenko , 12-CR-626, 2013 WL 3934174, at *2 (E.D.N.Y. July 30, 2013) (Johnson, J.) (finding evidence of "hundreds of pertinent recorded conversations and email exchanges that reveal [the defendant's] role in the conspiracy" weighed against release). This evidence appears strong, and this factor weighs in favor of continued detention. See United States v. Bruno , 89 F.Supp.3d 425, 431 (E.D.N.Y. 2015) (" 'When evidence of a defendant's guilt is strong, and when the sentence upon conviction is likely to long ... a defendant has stronger motives to flee.' " (quoting United States v. Iverson , 14-CR-197, 2014 WL 5819815, at *4 (W.D.N.Y. Nov. 10, 2014) (Arcara, J.) ) ).
*254 Moreover, the Court is not convinced Defendant-college-educated in finance and employed as a business development executive-was "unaware that fraud in connection with loans he specifically negotiated through international investment banks would be sold to investors in the United States." Gov.'s Opp'n. at 8. As the Government notes, "[i]t is hornbook law that ... ignorance of the law is not a defense and the government is not required to prove that the defendant was aware of the specific law that he is charged with violating." Id. (citing Bryan v. United States , 524 U.S. 184, 194, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (internal quotation marks omitted) ). At this time, the Court cannot reasonably conclude Defendant has strong extraterritoriality and willfulness defenses that can seriously rebut the weight of the evidence against him.
C. The History and Characteristics of Defendant
In assessing Defendant's characteristics, the Court looks to "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct." Fishenko , 12-CR-626, 2013 WL 3934174, at *2 (quoting 18 U.S.C. § 3142(g)(3) ).
As noted, Defendant is, at 40 years of age, a successful businessman and an experienced international traveler. He is a citizen of Lebanon, Antigua, and Barbuda and has no ties to the United States. With college and graduate degrees in finance, he is employed as a business development executive for Privinvest, an international naval, commercial, and private shipbuilding company based in Abu Dhabi, UAE. See Pretrial Services Report ("PSR"), ECF No. 38. Defendant has an approximate net worth of $ 4,556,700.00 and stands to inherit the proceeds of a bank account that has a current approximate value of $ 7,000,000.00.[4] See PSR at 3. According to defense counsel, Defendant is also a beneficiary of a trust that holds two London-based apartments purchased by a Privinvest subsidiary.
The Government argues Defendant's deceptive character, substantial wealth, minimal ties to the United States, and extensive ties to countries without extradition weigh in favor of continued detention. According to the Government, Defendant provided work visas bearing false information to Mozambican co-conspirators, assisted them in obtaining UAE bank accounts, and took steps to avoid detection, all pointing to "a demonstrated ability to bribe government officials, and to use fraudulent documents to assist co-conspirators in their travel to foreign jurisdictions." Gov.'s Mem. at 17. The Government contends Defendant, in addition to his own wealth, has vast financial resources, including the $ 15 million he allegedly received for his role in orchestrating a massive $ 2 billion corruption scheme, and the assets of his employer Privinvest and its billionaire owner, who may possess a strong interest in assisting his flight. Id. at 16-17. Given Defendant's lack of ties to the United States, and strong ties to the UAE and Lebanon, two countries that do not have extradition treaties with the United States, the Government argues nothing binds Defendant to stay. Id. at 18.
The defense argues Defendant's wealth and ties to foreign countries that may not grant extradition are insufficient bases for denying bail. According to the defense, "Defendants who possess, or have access to, 'significant financial resources' are routinely *255 released on bail, despite the fact that these defendants 'could' use their wealth to fund a theoretical escape from the country." Def.'s Mem. Ex. ¶ 36. Moreover, concerns about Defendant's wealth should be mitigated under circumstances, in which private security has been retained to ensure Defendant cannot escape home detention. See Sabhnani , 493 F.3d at 72, 77 ; see also United States v. Esposito , 18-CR-923, 749 Fed.Appx. 20, 23-25, 2018 WL 4344332 at *3-4, 2018 U.S. App. LEXIS 25654 at *8-9 (2d Cir. 2018) (noting economic equality concerns were not present in [ Sabhnani ] because the defendants' wealth was a significant contributor to their flight risk, and defendants of lesser means, lacking the resources to flee, might have been granted bail without such a condition in the first place). Although the defense admits Defendant has no ties to the United States, Defendant is willing to relocate his family for the duration this case. His Lebanese citizenship, defense argues, "merely suggests a hypothetical opportunity to flee exists" and falls short of demonstrating an actual risk of flight. Def.'s Appeal at 13.
The Court disagrees. Each factor is not considered in isolation. This Court must look to the totality of the circumstances and of Defendant's characteristics, which ultimately demonstrate a risk of flight. It is not, as Defendant puts it, "just that the person is a foreigner" or "just that the person has means." January 22, 2019 Tr. 20:22-24. Rather, the combination of Defendant's alleged deceptive actions, access to substantial financial resources, frequent international travel, complete lack of ties to the United States, and extensive ties to foreign countries without extradition demonstrates Defendant poses a serious risk of flight. See, e.g., Zarrab , 15-CR-867, 2016 WL 3681423, at *8 ("Defendant's lack of ties to the United States; his significant wealth and his substantial resources; his extensive international travel; and his strong ties to foreign countries, including countries without extradition ... among others stated, provide [the defendant] with the incentive and the wherewithal to flee and render him a flight risk."); United States v. Epstein , 155 F.Supp.2d 323, 326 (E.D. Pa. 2001) (Bartle, J.) ("The crucial factor, however, is defendant's lack of ties to the United States and his extensive ties to Brazil with which no extradition treaty exists. In our view, his forfeiture of $ 1 million worth of assets in the United States would not deter him from flight when in Brazil he has significant wealth, a lucrative job, the presence of his family, and insulation from ever being forced to stand trial."). Although Defendant expressed his willingness to relocate his family (currently living in Lebanon) to the United States during the pendency of this case, efforts to create ties to the United States where none previously existed do not sufficiently diminish Defendant's flight risk under the unique circumstances here. Notwithstanding the Defendant's proposed conditions of bail, the history and characteristics of Defendant favor continued detention.
In light of these concerns, the Court concludes the Government has shown by a preponderance of the evidence Defendant poses a serious risk of flight.
II. The Government Has Demonstrated No Conditions or Combination of Conditions Can Reasonably Assure the Defendant's Appearance in Court
Notwithstanding Defendant's risk of flight, the defense argues it would be "virtually impossible" for Defendant to flee under his proposed bail package-which in effect creates a private jail for Defendant. Defendant would be detained in the presence of 24-hour private armed guards, who *256 would be responsible for keeping him confined in a highly securitized and heavily monitored residence.
According to the defense, "[n]o defendant has ever failed to appear in any of the cases in this Circuit where private security was imposed as a bail condition" Def.'s Mem. Ex. A ¶ 8. Defendant points to cases in which courts have released defendants like himself-foreign nationals of means from countries that do not extradite-under stringent bail conditions like those proposed in this case. See, e.g. , Order, United States v. Seng , 15-CR-706, 2017 WL 2693625 (S.D.N.Y. Oct. 23, 2015) (granting release of Chinese national charged with FCPA violations and conspiracy to commit the same pursuant to a bail package that included home confinement and round-the-clock private armed security). In the Federation Internationale de Football Association ("FIFA") cases, in which the Government charged twenty-five foreign nationals with participation in a wire fraud scheme involving bribes paid to FIFA officials, all defendants arraigned were released on bail. See, e.g. , Order Setting Conditions of Release and Appearance Bond, United States v. Jimenez , 15-CR-252, (E.D.N.Y. Mar. 3, 2016) (granting bail of Guatemalan national charged with accepting hundreds of thousands of dollars in bribes despite his access to significant wealth and limited ties to the United States); Order Setting Conditions of Release and Appearance Bond, United States v. Rocha , No. 15-CR-252 (E.D.N.Y. May 18, 2016) (granting bail of Nicaraguan national accused of accepting bribes despite his limited ties to the United States). The defense argues United States v. Bodner is "particularly instructive because it involved a wealthy Swiss-national-who could not be extradited from Switzerland-charged with bribery and money laundering offenses in connection with Azerbaijani oil transactions and for whom bail was granted over the Government's objection." Def.'s Mem. Ex. ¶ 30 (citing Bodner , 03-CR-947, 2004 WL 169790, at *2 (S.D.N.Y. Jan. 28, 2004) (Scheindlin, J.). Moreover, the defense notes "[i]n at least five of the cases where the court approved bail conditions that included private security, the United States Attorney's Office for the Eastern District consented to these bail conditions." Def.'s Mem. Ex. A ¶ 8 (listing cases). "Given these precedents," the defense asserts it is clear Defendant's proposed conditions, "which are meaningfully more vigorous than those proposed in the cases described, are sufficient to ensure Mr. Boustani's continued appearance in court." Id. ¶ 33.
Each of these cases are distinguishable in important ways. The defendants in Seng , the FIFA cases, and Bodner all voluntarily waived extradition to the United States, and none of them were alleged to have procured false travel documents. Although the defense emphasizes the Swiss defendant in Bodner "could not be extradited," he nevertheless consented to execute a waiver of extradition from Switzerland and forego any rights he may have in Switzerland to fight a return to the United States. That the Government has previously agreed to private jail proposals in other cases highlighted by the defense, yet strenuously opposes bail here, further underscores the serious concerns Defendant's pretrial release would present.
Having carefully evaluated Defendant's bail proposal under the circumstances of this case, the Court is convinced no conditions can reasonably assure Defendant's appearance throughout the pendency of this case.
First , based on the financial resources reported by Defendant, the amount of cash offered as collateral does not appear sufficient. See Sabhnani , 493 F.3d at 77 ("[T]he *257 deterrent effect of a bond is necessarily a function of the totality of a defendant's assets") Given that Defendant's net worth and assets amount to well over $ 11 million, the Court is not convinced the $ 1 million cash offered as collateral would meaningfully induce Defendant to stand trial. Cf. Bodner , 03-CR-947, 2004 WL 169790, at *2 (holding a $ 1.5 million bond, and home confinement, a sufficient condition of release for Swiss national defendant with a net worth of $ 2.4 million). Nor does Defendant offer any sureties who would stand to lose financially if he were to flee. Compare Endorsed Letter, United States v. Nejad , 18-CR-224 (S.D.N.Y. May 31, 2018), ECF No. 31 (releasing on bail an Iranian national, charged with violating U.S. economic sanctions, pursuant to a $ 20 million bond, secured by assets based partly in the United States, with 15 different co-signers approved by the Government). Defendant has no assets in the United States and "has also thus far not indicated the source of $ 1 million in cash he is posting, and whether it is traceable to funds from the fraud scheme the government charges or comes from Privinvest's billionaire owner." Gov.'s Mem. at ¶ 9. The Court is not persuaded the proposed bail package, funded by substantial, unknown, and unverified sources, would reasonably assure Defendant's appearance in court proceedings. See United States v. Raniere , 18-CR-204-1, 2018 WL 3057702 at *7 (E.D.N.Y. June 20, 2018) (Garaufis, J.) (denying pre-trial release where there were "grave concerns" that defendant's proposal would be paid for by "an unidentified trust funded by anonymous third parties").
Second , Defendant's forfeiture of his two passports does not mitigate his risk of flight. See, e.g., United States v. Bonilla , 388 F. App'x 78, 80 (2d Cir. 2010) (affirming detention order "even though [defendant] offered some evidence to challenge the statutory presumption of flight" based on surrender of his passport). As noted above, the Government has alleged Defendant procured visas and employment documents with false information for his co-conspirators.
Third , the Court is not persuaded the private armed guards responsible for preventing Defendant's escape would reasonably ensure his appearances throughout this case. Def.'s Mem. Ex. A at ¶ 7. Guidepost employees would face a clear conflict of interest-private prison guards paid by an inmate. To illustrate this Court's concerns, and as the Government notes, "the defendant in [ Seng ], who was released to private armed guards from Guidepost in an arrangement similar to what defendant proposes here, was outside of his apartment virtually all day, every weekday; was visited by a masseuse for a total of 160 hours in a 30-day period; and went on an unauthorized visit to a restaurant in Chinatown with his private guards in tow." Gov.'s Mem. ¶ 10. In his affidavit, Guidepost President Andrew O'Connell affirmed no Guidepost employee or officer would operate as an employee of, or take any direction from Defendant or his employer, and Defendant would not supervise them or otherwise have any control over their duties. See Def.'s Mem. Ex. 3, Ex. A ¶ 4. This Court finds instructive the following reasoning from Judge Walton of the U.S. District Court for the District of Columbia:
While the Court has no reason to believe that the individuals selected for the defendant's security detail would intentionally violate federal law and assist the defendant in fleeing the Court's jurisdiction, it nonetheless is mindful of the power of money and its potential to corrupt or undermine laudable objectives. And although these realities cannot control the Court's ruling, they also cannot be absolutely discounted or ignored.
*258 United States v. Tajideen , 17-CR-46, 2018 WL 1342475, at *6 (D.D.C. Mar. 15, 2018).
Fourth , Defendant's private jail proposal raises several issues related to use of force. Although Defendant has consented to the use of "any" force by Guidepost and has waived his right to sue any party in connection with the risks and dangers associated with escape attempts, it is not clear such an agreement is enforceable-and the defense fails to point to precedent suggesting it would be. Defendant cannot consent to the use of deadly force. And as noted in Raniere , "any escape attempt would also present the risk of a confrontation between armed guards and Defendant (or his followers) in the streets of New York City, which would mean that any reduction in the Defendant's flight risk from this proposal would be at least partially offset by a greater risk to the community." 18-CR-204-1, 2018 WL 3057702 at *7. This is why, as the Government correctly notes, federal prisoners should be detained in facilities run by trained personnel from federal correctional facilities. See Sabhnani , 493 F.3d at 74 n. 13 ("To the extent [armed private guards] implies an expectation that deadly force may need to be used to assure defendant['s] presence at trial ... [s]uch a conclusion would, in fact, demand a defendant's detention"). Ultimately, the Court concludes private security is no substitute for a federal correctional facility under the unique circumstances in this case.
Finally , although this Defendant has vast financial resources to construct his own "private prison," the Court is not convinced "disparate treatment based on wealth is permissible under the Bail Reform Act." Bruno , 89 F.Supp.3d at 431. "[T]roubled by th[e] possibility" that wealthy defendants could lawfully buy their way out of incarceration by constructing their own prison, the Second Circuit has not decided whether district courts "routinely must consider the retention of self-paid private security guards as an acceptable condition of release before ordering detention." United States v. Banki , 369 F. App'x 152, 153-54 (2d Cir. 2010). Although courts in this jurisdiction have permitted private jail solutions where there was no possibility one "defendant might be detained while a wealthy defendant could be released with a private guard solution," Esposito , 18-CR-923, 749 Fed.Appx. at 24, 2018 WL 4344332, at *3, Defendant's release could very well produce disparate treatment based on wealth, as other co-defendants may not currently possess the financial capacity to pay for the private jail solution Defendant requests. See Gov.'s Mem. ¶ 13.
CONCLUSION
For the foregoing reasons, the Court concludes the Government has demonstrated by a preponderance of the evidence Defendant is a flight risk, and no combination of conditions can reasonably assure Defendant's presence at future court proceedings. Accordingly, Defendant's motion for appeal of detention is DENIED. Defendant will remain detained pending trial or another final disposition of this action.
SO ORDERED.

The defense notes "Mr. Boustani's travel documents have already been surrendered to the FBI." Def.'s Proposed Findings of Fact and Conclusions of Law ("Def.'s Mem.") Ex. A ¶ 9-10, ECF No. 36-1.

If there are objections to the retention of Guidepost, Defendant will retain an alternative private security firm that is acceptable to the Government, Pretrial Services, and the Court. Def.'s Mem. Ex. A ¶ 5.

Surveillance and security technology includes: (1) motion sensors on all windows and exterior doors; (2) 24-hour camera recording throughout the residence, except for the bathroom and master bedroom, with all videotape preserved and immediately available to the Government on request; (3) bi-weekly searches of the residence for weapons or contraband; and (4) screening of all visitors (and their possessions) for weapons or contraband with a metal detector and pat-down searches by armed officers. Def.'s Mem. Ex. A at ¶ 5.

Defendant advised his counsel he gifted his father those funds, and his father is responsible for managing the account and investing the principal. See PSR at 3.